■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN A. McINTYRE, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered January 23, 1978, convicting him of attempted murder in the second degree, upon a jury verdict, and imposing sentence. Judgment reversed, on the law and the facts, indictment dismissed, and case remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion pursuant to CPL 160.50. Appellant was convicted of attempted murder on the basis, primarily, of the identification testimony of the alleged intended victim, Willie Jackson (also known as "Willie Blood"), and of a witness who described himself at trial as Jackson's "adopted brother", Leo Miles. Jackson testified that around midnight on April 21, 1976, he was sitting in the back room of the Soft Touch Lounge, where he worked as the "bouncer", with his brother, his brother's wife and the bar's manager, Samuel Walker. A stranger whom Jackson identified at trial as the appellant, entered the room and allegedly sought to purchase drugs. Jackson said he denied that drugs were sold there, and the conversation ended. A short while later, the man again accosted Jackson, this time at the front of the bar. They walked toward the back of the bar, the stranger identified himself as "John-John" and, after further conversation, pointed a pistol at Jackson. Jackson bolted for the front door and the stranger fired two shots, neither of which hit Jackson. Outside of the bar, Jackson heard two more shots fired and saw a woman, identified as Deborah Cousar, fall to the ground. (At trial, Cousar testified that she had been injured by "pellets" in her face and back.) Jackson saw the stranger bending over the woman telling her that she was not hurt. When Jackson returned to the bar he saw that Miss Cousar, who was bleeding, had been helped inside. He and Leo Miles (now described as his "half-brother") then drove around the neighborhood but were unable to find the man who fired the shots. When Jackson returned, there were "maybe thirty" police officers at the bar. Jackson said he spoke to "Maybe all of them * * * But I didn't speak to anyone specific, to give no statement or nothing like that." The following day, Jackson testified, he received a call from a man known to him as "Rooster", as a result of which Jackson learned that the man who fired the shots could be found in a store on New York Boulevard and was wearing a light orange suit. Rooster had not been present at the Soft Touch Lounge when the shooting occurred. Jackson called the police and drove with them to the location mentioned. In the police car, Jackson told the police that the assailant would be wearing a light orange suit. The officers

entered the store and apprehended the appellant, whose clothing matched the description Jackson gave. Outside the store, Jackson identified the appellant as the shooter, as he did again at trial. Leo Miles also testified on behalf of the prosecution. He was Jackson's adopted brother and was in the office of the Soft Touch Lounge on the night of the shooting with Jackson, "the owner; *[sic]* Bill, his wife, and one other lady". He saw appellant enter the room and had previously seen appellant many times in the neighborhood. Miles testified that he observed appellant fire a gun at Jackson twice and made an in-court identification. Miles also testified that he drove through the neighborhood with Jackson after the shooting in an unsuccessful attempt to find Jackson's assailant. When he returned to the bar, there were "a lot of police officers there." Miles left the bar without speaking to the police. Deborah Cousar testified that she had been standing on the street in front of the Soft Touch Lounge on the night in question when two men approached the bar. One of them told her that they were looking for Willie Jackson and that "something [was] going to happen on the inside of the bar, a shooting." As she walked across the street she heard a shot in the bar. A moment later, Willie Jackson ran past her, she "felt" another shot and fell to the ground with shotgun pellets in her face and back. Later she was assisted into the bar. The testimony of Samuel Walker, the owner of the Soft Touch Lounge (and sometimes referred to as "Bill" in the trial testimony), generally tended to corroborate the testimony of Jackson and Miles. Walker, however, was unable to positively identify appellant as the man who had fired the shots at Jackson. Detective Thomas Pinder, one of the police officers who responded to the scene on the night of the shooting, also testified on the People's behalf. Detective Pinder stated that he had interviewed three witnesses at the scene: Willie Jackson, Samuel Walker and Robert Henderson. Detective Pinder's account of these witnesses' statements to him differed significantly from the other testimony offered by the prosecution. According to Detective Pinder, Jackson had told him that Robert Henderson (not Leo Miles) was his brother and had been with him on the night of the shooting. Jackson never mentioned Leo Miles, nor did Detective Pinder see him that night. Furthermore, Jackson was unable to describe the perpetrator and never mentioned that the perpetrator had called himself John-John. Jackson had not stated that the perpetrator had shot at him, but merely that he heard two shots in the bar. Detective Pinder also recalled interviewing Robert Henderson. Henderson had stated that he was Jackson's brother and that he was in the back room with Jackson when the events in question occurred. Henderson told the same story that Jackson told that night. (At trial, Miles denied that Robert Henderson is Willie Jackson's brother, or that he, Miles, was known by any other name.) Detective Pinder additionally testified to two interviews with Deborah Cousar, the woman who was injured by gunfire outside the Soft Touch Lounge. Pinder's police report of those interviews was admitted into evidence. The report states that in two separate interviews after the shooting, the "complainant" (Deborah Cousar) identified "the person that shot her" as one "Lawson Aheart" (Ahart). In the first interview, she gave Ahart's approximate address; in the second interview, she stated that she has known the assailant for *"about 9 years"* and that she was talking to him right before the shooting. On cross-examination, Cousar had denied telling a detective that Lawson Ahart was the man who had shot her. The defense case had three major thrusts: that the shootings in and near the Soft Touch Lounge were perpetrated by persons identified as other than the appellant; that Jackson testified falsely against appellant in an attempt to "frame"

him, in retaliation for appellant's efforts (after the shooting incident but prior to trial) to stop drug trafficking at the Soft Touch Lounge; and an alibi defense. Appellant testified that he met a friend, Lawson Holland, late in the afternoon prior to the shooting and from there went to his girlfriend's home, where he remained continuously until well after the incident at the Soft Touch Lounge. This testimony was corroborated by Holland and by both of the girlfriend's parents. Appellant further testified that while he was in jail awaiting trial, another inmate told him that George Brown (whom appellant knew as "Rooster") had been responsible for his arrest. The inmate also gave him a telephone number where Jackson could be reached. The trial court permitted appellant to testify extensively as to his telephone conversations with Jackson. According to appellant, when Jackson was asked why he had lied and had appellant incarcerated, Jackson answered that he had done so because appellant had "come out of jail with those crazy ideas; you wanted us to stop selling dope over this way, man, and dope was here before you came, man." Jackson allegedly further said that the "only thing I want from you is your word as a man that you will never worry about us selling dope within the community, and tend to your business." Appellant replied that his main concern was getting out of jail and getting a master's degree from John Jay College and if he was released, "I'm not going to bug you." Jackson told appellant that a man named Eddie had fired the shots in the bar and that a second man, "Carter", had fired the shotgun that had struck Deborah Cousar. Appellant further testified that after Jackson came to court to testify at the *Wade* hearing, appellant called him to find out why, contrary to what he had said, he had come down to tell his false story. Jackson answered that he had tried to avoid coming down and that, in fact, a subpoena from the District Attorney had been placed under his door and he had torn it up; however, for the last two or three weeks, a District Attorney's investigator had been looking for him. Jackson concluded (according to appellant), "What do you want me to do, go to jail for perjury? They are forcing me to testify." In another conversation, Jackson told appellant that he had been "running from the district attorney" and had told the District Attorney that he was in Chicago. Jackson purportedly said, "Man, I'm going to have to come testify or they going to get me for perjury." He said that he would not testify that appellant shot at him. Appellant told him, however, that if he testified, appellant would himself testify and mention the drug operation involving people at the Soft Touch Lounge that appellant had been trying to stop. Lawson Holland testified that he was in the Soft Touch Lounge at the time of the shooting. He had gone there earlier that night to purchase marihuana and had remained. At about midnight three men drove up to the bar, two of whom exited the car and walked toward the bar. One of the men who got out of the car, Eddie (whom he knew from the neighborhood), was about five feet and eight or nine inches and the other was between six feet and one or two inches tall. The taller man went to the side of the bar while Eddie went to the back. Suddenly, Holland heard a shot and saw Willie Jackson (whom he knew as Willie Blood) run out of the bar with Eddie behind him, shooting. After taking cover, Holland left the bar. Deborah Cousar, whom he knew, had also left the bar but walked in the opposite direction from him. Outside the bar, he heard a blast "louder than a pistol" and heard someone holler. Holland had known appellant for approximately four years from the neighborhood and from jail. He testified that appellant was not at the Soft Touch Lounge at the time of the shooting. Another defense witness, William Harris, testified to a conversation with Jackson in which the latter informed

Harris that he did not know who had shot at him in the Soft Touch Lounge but that he "had reason for [appellant] to be off the streets." On the People's rebuttal, Jackson denied having had a conversation with Harris. He admitted that he had spoken to appellant a number of times on the telephone, but denied telling appellant that he had been forced to testify by the District Attorney's office. On cross-examination, he denied both that he had been subpoenaed to come to court and that there had been a warrant for his arrest. After both sides rested, appellant personally requested the court to allow the jury to be informed that Jackson had been subpoenaed to testify on the People's behalf. Upon questioning by the court, the prosecutor stated that prior to the hearing to suppress identification testimony, an arrest warrant for Jackson had been issued but never served because Jackson had "responded without the necessity of bringing him in with the arrest warrant." The court then asked the prosecutor if Jackson had been subpoenaed for trial and was told that he had not been subpoenaed. However, after continued questioning, the prosecutor stated that at the *Wade* hearing, Jackson had appeared after "He was sent subpoenas and he was also called on the phone." Appellant's application was denied on the ground that it was an improper request to introduce independent testimony on a collateral matter, namely, the credibility of Jackson's statement that he had not been subpoenaed to testify. Some three months after sentence was imposed, appellant moved *pro se* to vacate the judgment on the ground of newly discovered evidence. The basis for the motion was a letter to appellant from one A. C. Doyle, in which the writer claimed that he had been present when Willie Jackson had offered to pay anyone who would testify against appellant at trial and that Leo Miles had accepted the offer. The writer further stated that Leo Miles had no knowledge of appellant other than what he had been told by Jackson. The trial court denied the motion without a hearing. In our opinion, the evidence presented by the prosecution at trial fails to establish appellant's guilt beyond a reasonable doubt. First, Detective Pinder's account of his interview with Jackson at the scene casts serious doubt on the accuracy of Jackson's trial testimony. According to Pinder, Jackson was not only unable to describe the assailant, but failed even to mention that the shots were aimed at him. Moreover, Pinder's testimony as to Jackson's statement that Robert Henderson was the latter's brother and was present in the back room contradicted both Jackson's and Miles' assertions that Miles was the brother who was with Jackson when the assailant entered the back room. Such a fraternal shell game not only undermines the credibility of both Jackson and Miles, but also tends to corroborate the testimony offered by the defense to show that Jackson sought to "frame" appellant. The notable contrast between Jackson's hazy description of the events to Detective Pinder and the later apparent certainty of his out-of-court identification, together with the convenient substitution of brothers, strongly suggests a deliberate attempt after the fact to tailor events so as to inculpate the appellant. The internal inconsistencies of the People's case were exacerbated by the prosecutor's admission that subpoenas and an arrest warrant had been issued to compel Jackson's testimony. The evidence of attempts to compel Jackson to testify, which appellant sought to introduce, was not merely an effort to impeach Jackson's testimony that he had never been subpoenaed with a prior inconsistent statement. Such evidence tended to corroborate appellant's claim that Jackson had attempted to refrain from testifying falsely against appellant and that Jackson in fact testified falsely out of a subjective fear that he would be charged with perjury. The evidence was thus relevant to a showing

that Jackson had a motive to lie and is not collateral (see *Potter v Browne,* 197 NY 288, 293; *People v McCormick,* 278 App Div 410; Fisch, New York Evidence [2d ed], § 469). Had it been admitted, such evidence would have undercut further the prosecution's already questionable case. Second, Miles' testimony also contained glaring contradictions of other prosecution witnesses. Miles testified, for instance, that the man who fired the shots re-entered the bar and, inside the bar, told Deborah Cousar that she was not hurt. Jackson testified, however, that this statement was made on the street, and a fair reading of Cousar's testimony would indicate that she was taken into the bar "a few minutes" after the assailant or assailants had left the scene. In another suspicious inconsistency, Jackson testified at the *Wade* hearing that he was in the back of the bar with his brother, his brother's wife and the owner. Miles, the brother who was supposedly in the back room with Jackson, testified, however, that the only occupants of the back room besides Jackson and himself were the owner (apparently referred to as "Bill") and *his* wife and "another woman". These subtle but important discrepancies cast further doubt on both Jackson's and Miles' testimony. They tend to corroborate appellant's offer of proof that Miles was Jackson's recruit in an effort to "frame" appellant, and lend over-all support to the defense that Jackson's testimony was purposefully fabricated. Furthermore, the evidence given by the prosecution's own witness, Detective Pinder, was also consistent with the defense theory in that the detective never saw or spoke to Miles on the night of the incident, and there was no other police record of Miles' presence at that time. Third, the out-of-court identification of appellant by Jackson also had its unusual features. The day after the shooting, "Rooster" called Jackson and informed him that "the guy [who] had shot at me was on New York Boulevard." Rooster's identification of appellant with such apparent certainty is not easily reconciled with common sense, given the fact that Rooster was not present at the scene of the shooting. One "explanation" is that Jackson afforded Rooster such a detailed and accurate description of the assailant (whom he stated he had never before seen) that Rooster was able to conclude positively that appellant was the one who did the shooting. It is also possible that Miles, who testified that he knew appellant previously, conveyed appellant's name to Rooster, but the record does not show whether Miles in fact knew appellant's name at the time of the shooting and, as already noted, leaves reasonable doubt as to whether Miles was actually present at the scene of the crime. In any event, Miles himself never testified to any communication with Rooster. Such attempts to rationalize Rooster's role consist of improbabilities stacked on speculation and necessarily leave serious questions concerning the accuracy of the out-of-court identification. It may be noted, parenthetically, that the only other prosecution witness besides Jackson's brother who was present in the back room with Jackson and had an opportunity to observe the assailant was Samuel Walker, who failed to make a positive in-court identification of the appellant. Finally, not the least disturbing aspect of the trial evidence is the police report of Detective Pinder's two interviews with Deborah Cousar on the day following the shooting. Although hearsay in the strict sense, the interviews have a high degree of reliability because they were conducted close in time to the event in the presence of persons with a business duty to report accurately and because the declarant was present at trial and available for cross-examination (see, generally, McCormick, Evidence [2d ed], pp 601-603). Cousar's reported conversation just before the shooting with a man other than the appellant (Lawson Ahart) who stated that a shooting was about to take place and whom Cousar said she had

known for nine years is a strong rebuttal to her trial testimony implicating the appellant and, in our opinion, is relevant on the legal question of reasonable doubt. Additionally, the police report further suggests that there were two perpetrators and not one (an unidentified woman identified "the one with the shotgun" as one Ernest Carter) and thus tends to reconcile Jackson's testimony that his assailant wielded a pistol with Cousar's testimony that she was hit in the face and back with "pellets". Further, Jackson's testimony includes no direct reference to two gun-wielding assailants, although Jackson was present both inside and outside the bar during the attack and had enough presence of mind to remember who his own assailant was. The police report also tends to corroborate the eyewitness testimony of the defense witness, Lawson Holland, who stated that two men entered the bar before the shooting began, one of whom was named "Eddie". It may be that no one of the facets of this case noted here is sufficient to create a reasonable doubt as to appellant's guilt. We are convinced, however, that the cumulative effect of the many internal inconsistencies of the People's case and the frequent consistency of the prosecution's evidence with the exculpatory theories of the defense shows that the verdict of guilt is against the weight of the evidence (see CPL 470.15, 470.20, subd 5). Although the evidence may not establish conclusively that appellant was not an assailant, it is to be remembered that appellant was not required to prove his innocence. We conclude, therefore, that the character of the prosecution's evidence is such that the People have failed to sustain their heavy burden of proof. O'Connor, J. P., Rabin, Gulotta and Shapiro, JJ., concur.