THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ANGEL PEREZ, Appellant.

Second Department, April 9, 1984

**APPEARANCES OF COUNSEL**

*Angel Perez, pro se,* and *Freda S. Nisnewitz* for Angel
Perez, appellant.

*Elizabeth Holtzman, District Attorney (Barbara D. Un-
derwood, Roseann B. MacKechnie* and *Sarah G. Noll* of
counsel), for respondent.

NIEHOFF, J.

On September 16, 1977, the defendant, Angel Perez, Antonio Calderone, Benedicto Muniz, also known as Junior, and others were in an apartment located at 586 Crescent Street, Brooklyn, New York. The defendant Angel Perez took out a gun and demanded that Junior turn over his money. Junior ignored the demand and after the defendant fired a shot toward the apartment wall, Junior told him he should not play with guns. Calderone said "kill him". The defendant complied with this suggestion or direction and shot Junior in the chest. The defendant then took money out of Junior's hand and Calderone removed money from Junior's socks.

The above sequence of events took place in the presence of two eyewitnesses, Jose Marcano and Cecilia Matos who testified at trial. These eyewitnesses knew both the defendant and Calderone prior to the commission of the crime. The eyewitnesses, as well as Nydia Marcano and Iris Maldonado lived in the apartment where the crime occurred. In addition to the two eyewitnesses to the actual shooting, the People produced Nydia Marcano and Iris Maldonado, who heard the shots and came upon the crime scene moments later. Iris Maldonado was in an adjacent bathroom and Nydia Marcano entered from the hallway. Both Iris Maldonado and Nydia Marcano testified that as they entered the kitchen they observed the defendant holding a revolver and that Perez told them he would kill them if they did not shut up. The final prosecution witness (other than law enforcement personnel) was the decedent's father who was called primarily to explain that the money on his son's person was the proceeds of a settlement from a childhood accident.

Defendant was convicted of the crimes of murder in the second degree and manslaughter in the first degree. Manifestly, the proof of such crimes by defendant was overwhelming and none of the members of this court holds to the contrary. Quite apart from the sufficiency of the evidence argument, upon which ground defendant seeks a reversal of his conviction, defendant advances a number of claims of alleged error committed at the trial which he

argues warrant a new trial and he asserts that the sentence of 25 years to life was excessive. The members of this court are divided on only one issue, namely, whether defendant was deprived of a fair trial by the Trial Judge's failure to direct the prosecutor to turn over to defense counsel the tape and transcript of one of two telephone conversations, to which the witness Nydia Marcano was a party, which conversations were made more than eight months after the murder of Junior Muniz.

The record reveals that on direct examination Nydia Marcano testified that she knew the defendant Perez for more than eight years because he had been living with her sister Suzanna Marcano who is also known as Clara. About 9:00 P.M. on the evening of the homicide, Nydia Marcano left her apartment. Once outside, she saw that it was raining and she returned to the apartment to fetch an umbrella. As she was going down the hallway Nydia heard two gunshots and when she re-entered the apartment she saw Perez with a gun in his hand, at which time he threatened her. Later on, Nydia Marcano went down to the station house where she was questioned as to the events of the evening.

At the conclusion of her direct testimony, the prosecutor turned over to defense counsel a transcript of Nydia Marcano's Grand Jury testimony and the prior statement concerning the murder given by her to the District Attorney's office.

After cross-examination of the witness by Calderone's attorney, Perez' counsel started his cross-examination; but because of the lateness of the hour, the cross-examination was interrupted and the trial continued to the next morning.

The issue with respect to the transcripts of the tapes arose only because defense counsel had been informed by the defendant's family that Nydia had solicited the sum of $500 from defendant's family for not testifying in the case. On the second day of cross-examination, based upon what he had been told by his client's family, defense counsel cross-examined Nydia Marcano concerning the alleged "bribe" request. When counsel asked Nydia if she had called any member of her sister Suzanna's family to ask for

money, Nydia responded "No". When defense counsel asked Nydia whether she had called Francesco Sememidey, defendant's stepson, and asked him to give her $200 she responded, to counsel's obvious surprise, that it was defendant's family that had come to her house and offered her money. When asked by defense counsel if she told "the District Attorney about that, that the offer of money?" Nydia replied "Yes". Defense counsel then asked Nydia: "About two weeks ago, did you call your sister, Suzanna, and tell her that you wanted $500 and you wouldn't show up in this court?", to which Nydia replied "I called her on the instructions of the District Attorney".

A bit later, defense counsel inquired, "Did you, about two weeks, make a phone call to Francesco Samaday [sic] [defendant's stepson] at his factory and ask him for $500 so you didn't come to court?" Again, Nydia replied, "I called him on instructions of the District Attorney". When asked what she said to Francesco and Suzanna and whether taping was involved ("Were you wearing a tape * * * Did you have something on your body recording this?"), Nydia told defense counsel that she made the calls from the District Attorney's office, that taping was involved, and that she was told to act as if she were accepting the money. When asked what Francesco said to her, Nydia replied "He said that he was going to speak to Kanno's [Perez'] brother, in order to take the money to me, to bring the money to me". Nydia's cross-examination on this point concluded with her stating that no meeting ever occurred and no money exchanged hands. Although defense counsel was thus made aware of the fact that there were at least two conversations and that they were taped, at no time during his cross-examination did defense counsel request production of the tapes and/or transcripts of the witness' telephone conversations with either Suzanna or Francesco.

On redirect examination, the prosecutor pursued the line of inquiry concerning the attempt by the defendant's brother to bribe Nydia. After the witness testified that there was a Detective Ramirez with her when she called from the District Attorney's office and that Suzanna had promised to contact the defendant's brother to get the money, the court, *sua sponte,* charged the jury as follows:

"THE COURT: Ladies and gentlemen of the Jury, there has been no evidence adduced that the defendant Perez himself was involved in this alleged offer of money".

The prosecutor then indicated that he had no objection to a limiting instruction to the jury that the questions concerning the bribe attempt dealt only with the credibility of this witness, and not to the guilt or innocence of the defendant. The court instructed the jury in the following language: "THE COURT: That is all, it's to be considered with regard to, and that is solely on the issue of credibility, not proof or [sic] innocence of this case, but only of credibility".

The prosecutor then concluded the examination of Nydia Marcano as follows:

Q And Mrs. Marcano, do you remember saying on the telephone, "Wasn't it $500 he offered me," and Suzanna Marcano —

MR. HIRSHMAN [Perez' attorney]: Your Honor, I'm going to object to this. He's leading [sic] from the statement, which I don't know anything about, and I haven't seen it.

THE COURT: Yes, he [sic] leading too. Sustained.

MR. CALLAN [The prosecutor]: I'll turn over a copy of the statement to defense counsel, Your Honor.

(Mr. Callan hands a copy of the statement to Mr. Hirshman at this point.)

THE COURT: Next question.

Q Mrs. Marcano, is there any doubt in your mind at this point that Angel Perez was the man with the gun in his hand when you went into the apartment?

A There is no doubt.

Q Is there any doubt in your mind that Chico was the man standing next to him?

MR. RIORDAN [Calderone's attorney]: Objection, Your Honor, to the form of the question.

THE COURT: Overruled.

A No.

MR. CALLAN: I have no further questions.

MR. RIORDAN: I have nothing else, Your Honor.

MR. HIRSHMAN: Nothing else, Your Honor.

THE COURT: You may step down.

Thus, even though defense counsel had possession of the four-page transcript of the conversation with Suzanna Marcano, who was Nydia's sister and defendant's wife, and knew that there had also been a taped conversation with defendant's stepson, defense counsel opted to forego any re-cross-examination of the witness. While Nydia was on the stand, defense counsel never asked for the other transcript and never inquired as to whether there were any additional statements by Nydia so that he could pursue any further cross-examination of the witness. One can hardly quarrel with that strategy in view of the fact that when defense counsel sought to brand Nydia as the solicitor of a bribe she responded by informing him that she had not sought a bribe but that members of defendant's family had sought to bribe her; that she had reported the attempted bribe to the District Attorney who had instructed her to appear to play along; and that her conversations with the defendant's wife and stepson made on instructions from the District Attorney were taped in the presence of a detective and an Assistant District Attorney. Inasmuch as the District Attorney was intimately involved with the conversations that took place with respect to a bribe and those conversations were taped in the office of the District Attorney, there was powerful evidence to support the conclusion that defendant's family had not been honest with defense counsel when they told him that Nydia had solicited a bribe. Although defense counsel did not concede on the record that Nydia was not lying concerning the bribe (he could hardly be expected to do so), by his conduct it is evident that defense counsel had become convinced that he could not shake Nydia on the bribe offer or use it to prove her to be a witness who was not worthy of belief. What occurred thereafter fortifies us in this assertion.

After Nydia left the stand and a luncheon recess took place, Perez' attorney, obviously distressed by the fact that, at the behest of the District Attorney, tapes were made indicating that members of the Perez family had sought to bribe a People's witness, which would possibly have a prejudicial fall-out effect on his client's case, pointed out to the trial court that before trial he had disclosed the bribe situation to the prosecutor and to the court, who determined that the subject was a matter for cross-examination.

Defense counsel expressed concern with the impression made on the jury because the jury was not aware of the fact that it was the defense who had called the matter of the bribe to the attention of the court before Nydia was cross-examined. Counsel's words were these: "And all I'm saying is that is the impression to the jury and nowhere is it reflected that this was brought to the Court's attention by the defense". Defense counsel evinced no concern whatever with the contents of the tapes and/or transcripts of Nydia Marcano's conversations for the purpose of impeaching her. Rather, his interest was in trying to satisfy the jury that his client, Perez, had nothing to do with the postcrime antics surrounding Nydia Marcano and that the acts of the defendant's family would not be held against the defendant by the jury. During the course of the colloquy which occurred after the luncheon recess the Assistant District Attorney advised the court and counsel that:

"I just want to be clear on the background or advise the Court of the background.

"Nydia Marcano came to my office and informed me that an individual by the name of Nelo, allegedly the brother of Angel Perez, had offered her $500 if she were to leave the jurisdiction and not testify in the case * * *

"[A]fter she informed me of this, I became quite concerned because, No. 1, it was going to interfere with a homicide trial and, No. 2, tampering with a witness is a felony. I therefore consulted with my superiors and we decided to initiate an investigation".

After reading a portion of the Nydia-Suzanna transcript the court told defense counsel: "It's apparent that your client's family was not honest with you, Mr. Hirshman. Had they told you that an initial offer had been made by them to the witness, it could have saved a lot of difficulty".

The prosecutor then put the entire episode into perspective when he noted that it was a classic example of a client or a client's family not leveling with counsel: "He [defense counsel] blindly proceeds on cross-examination and opens up the door on the situation. It goes only to the witness' credibility. I didn't raise the issue myself. Counsel raised the issue".

During the side bar conference counsel made it manifest that his concern was that the bribe issue would not reflect adversely against Perez. Thus, he stated: "What I am suggesting is, if this is the only call, that there is even more grounds to believe that it was done as an entrapping, so that this could not be used as an issue *to attack him on*" (emphasis added).

It was for that reason, and that reason alone, that defense counsel then for the first time, moved "to find out what information the District Attorney has with respect" to Nydia's testimony. We think it is abundantly clear from the record that defense counsel, who had been given one transcript pertaining to the alleged bribe offer, and did not utilize it for purposes of cross-examining Nydia, but, instead, excused her from the stand, was not seeking any other transcripts for the purpose of cross-examining her.

The prosecutor opposed the motion for the production of any other statements and the application was denied. Ultimately, the stepson, who according to the tapes, was involved in the bribe offer, testified for the defense. Significantly, defense counsel never questioned him on the subject of the alleged bribe.

Transcripts of the taped conversations relating to the attempted bribe have been provided to the court and it appears that there were only two such conversations, both held on the same day. The earlier conversation, alluded to above, was between Suzanna Marcano and Nydia and took place at about 9:45 A.M. on May 18, 1978. At trial, defense counsel was given a copy of the lengthier, four-page transcript of that conversation. The second conversation took place at about 10:10 A.M. on the same date and was between Nydia and Francesco Sememidey, defendant's stepson. The transcript of that conversation was the subject of defense counsel's belated request for production which was denied. Thus, we are called upon to determine whether under the circumstances of this case, the trial court committed reversible error and denied defendant a fair trial when it refused to direct the prosecutor to turn over the two-page transcript of the telephone conversation between Nydia Marcano and Francesco Sememidey. We conclude that the record does not justify defendant's assertion that he was denied a fair trial.

In our judgment, the subject transcript is not exculpatory material within the purview of *Brady v Maryland* (373 US 83) and *People v Simmons* (36 NY2d 126), and the court did not err in refusing to direct the prosecutor to turn it over to defense counsel on that ground. Nowhere in either transcript is there any statement made by Nydia Marcano which suggests, even remotely, that the defendant was innocent of the crime and was being falsely accused. However, even if the transcript could be broadly classified as *Brady* material because of the argument that it pertains to credibility, any error in not disclosing it would, in this case, be harmless.

We are also satisfied that the holding in *People v Rosario* (9 NY2d 286), does not call for a new trial in this case. Briefly stated, the *Rosario* rule requires the People to provide a defendant with an opportunity to examine a witness' prior statement provided the statement "relates to the subject matter of the witness' testimony and contains nothing that must be kept confidential" (*People v Rosario, supra,* p 289). The purpose of the rule "is to afford the defendant a fair opportunity to cross-examine the People's witnesses at trial" (*People v Poole,* 48 NY2d 144, 149).

As shown above, the record discloses that defense counsel did not request the subject transcript of the conversation to enable him to cross-examine or impeach the witness Nydia Marcano. There is no reasonable escape from the conclusion that defense counsel was satisfied that if he pursued with Nydia the subject of the alleged bribe he would do damage to his client's case beyond that which had already been done, when the jury learned that someone in defendant's family had sought to bribe Nydia and that Nydia, in cooperation with the District Attorney, had undertaken to obtain evidence of the bribe offer. The record reveals quite plainly that defense counsel, having opened the door to the bribe testimony, was troubled by the impact of that testimony on the jury. He was not looking to let the jury hear more about those tapes made in the District Attorney's office.

It can also be seen distinctly from the portions of the record quoted above, that counsel's principal concern with respect to the bribery business was that Perez might be

branded with his family members' wrongdoing. If counsel thought that it was beneficial to his client's cause to attack Nydia's credibility further than he had on cross-examination (by using the tapes) why would he, after having examined the four-page transcript of Nydia Marcano's telephone conversation, decide to forego re-cross-examination of the witness and excuse the witness from the stand without even asking for the other transcript whose existence was disclosed to him in the course of her cross-examination?

Manifestly, it was defense counsel's strategy not to ask any more questions of Nydia on the bribery issue for fear of its counterproductive effect on his client. This is further demonstrated by the fact that during his summation, when he referred to Nydia's testimony, defense counsel assiduously avoided making any claim to the effect that Nydia had solicited or considered taking a bribe. Indeed, the subject of the alleged bribe was left unmentioned by defense counsel. Again, as mentioned above, although defense counsel called defendant's stepson to the stand, he made absolutely no effort, when questioning him, to attack Nydia's credibility with respect to the alleged bribe. He completely avoided the subject.

In seeking reversal of defendant's conviction, appellate counsel offers to this court the following claim: "[D]efense counsel demanded to see all other tapes and transcripts in the possession of the D.A.'s office, between Nydia and others, relating to the alleged bribe offer, *so that he could, on re-cross examination, impeach Nydia's redirect testimony*" (emphasis added). The record unmistakably refutes the foregoing statement, which is the foundation stone on which defendant's *Rosario* argument rests. Trial counsel, who was "in the pit" and, so, was better able than appellate counsel to evaluate and judge the effectiveness of Nydia as a prosecution witness, elected (1) to forego his opportunity for re-cross-examination, and (2) to excuse her from the witness stand, notwithstanding that he knew the contents of one of the transcripts and knew of the existence of the other. He was so completely persuaded that he should not pursue the bribery issue any further with Nydia that he did not even request the other transcript before stating

that his examination of the witness was completed. Furthermore, as already pointed out, he ignored the subject of the alleged bribe when questioning the stepson and he ignored it when summing up.

As we see it, what we are presented with in this case is a classic example of appellate counsel's adopting a strategy different from that of trial counsel and, on the strength of the newly adopted strategy, asking for a new trial, notwithstanding that defendant was represented by competent trial counsel at the trial which led to his conviction and even though the trial was conducted fairly. In a word, appellate counsel has sought to manufacture a *Rosario* issue where such issue was not raised by trial counsel nor passed upon by the trial court. We are not prepared to vote for the reversal of these murder and manslaughter convictions, which are supported by overwhelming evidence, simply because appellate counsel has chosen to take on the role of "Monday morning quarterback". There is not the slightest reason presented to persuade this court that trial counsel, who presumably had the "feel" of the courtroom, made anything other than an intelligent decision when he chose not to pursue the bribery issue with Nydia any further.

Our conclusion that trial counsel deliberately steered clear of the bribery issue once he learned that Nydia reported the subject to the District Attorney, and, in cooperation with the District Attorney made tapes of "set up" conversations, cannot be cavalierly dismissed as mere conjecture. Admittedly defense counsel did not, in so many words, say that he was backing off on the bribery issue. One would hardly expect him to do so. But it takes no citation of authorities to establish the proposition that intention can be ascertained from action as well as words. This truism is summed up in an old familiar saying to the effect "What you do speaks so loudly that I cannot hear what you say". Appellate Judges must bring all their common sense and knowledge to bear on every situation presented to them and scrutinize with care the conduct of parties and their counsel as well as their words in order that justice be done. To us, what trial counsel did during the course of the trial with respect to the bribery issue

speaks so loudly that we cannot hear what appellate counsel says with respect to the so-called *Rosario* issue.

Before leaving this point, we think it appropriate to note that defendant in his *pro se* argument takes a view of the bribery issue which appears to us to be at variance with that of appellate counsel and which lends further weight to our conclusion. In his supplemental brief, defendant claims that he was denied effective assistance of counsel by his trial attorney. One of his assertions of error by trial counsel relates to the matter of the alleged bribe. But defendant does not criticize his counsel for not pursuing the issue with Nydia more diligently. On the contrary, he condemns his counsel for having made a "blunder" by injecting the bribe issue into the case. Defendant, who like his attorney, was present in the courtroom, and, so is better able to assess the impact of that testimony on the jury than appellate counsel can, realized full well that the bribe testimony was not helpful on the issue of Nydia's credibility and may have damaged whatever slim chance he had for an acquittal. Thus, defendant's argument, in his own words, is as follows:

"The second instance of ineffectiveness of trial counsel was where defense counsel was questioning a prosecution witness, Nydia Marcano, on cross-examination. Evidently trial counsel had obtained some information that this witness had asked for money for not testifying against the defendant. Counsel, without further investigation, blindly plunged ahead and asked a question related to this information. He was stunned to find out that there was an alleged bribe attempt to the witness, according to Mrs. Marcano's testimony, one of the defendant's family had allegedly offered her money not to testify.

"This of course was herasay [*sic*] testimony that would never have been permitted on the prosecution's direct case, and opened the door for the prosecution to further inquiry to this very prejudicial testimony. At this juncture, the strategey [*sic*] of defense counsel backfired, and left the defendant in a position before the jury that surely contributed to his being found guilty, as this evidence was damaging to the defendant.

"Defense counsel tried to explain to the Court in colloquy, * * * that the defendant and his family had given him mis-information. Counsel must bear the brunt of this blunder, as it is his responsibility to properly investigate all aspects of the defense strategey [sic], and to fail to interview a prosecution witness, that surely was available, would have prevented such a terrible basic mistake in trial preparation".

The People, who read the record as we do, respond to defendant's argument in these words: "The attorney's handling of the bribery issue * * * [was] the result of calculated trial strategy".

Appellate counsel asks us to order a new trial for the defendant upon the ground that defendant was denied a fair trial because trial counsel was deprived of the opportunity to question Nydia on the bribery issue as thoroughly as he might otherwise have done if he had seen the second transcript. But defendant himself has made it plain that he does not feel aggrieved because his counsel was not afforded the right to question Nydia with respect to the contents of the second tape. He is annoyed that his counsel even mentioned the subject of a bribe. What defendant is looking for is a new trial where no mention whatever will be made of the bribe offer. Like the Trial Judge, the prosecutor, and defense counsel, the defendant seems to have been convinced that Nydia could not be impeached successfully by further mention of the alleged bribe.

Thus, we are persuaded that the *Rosario* rule should play no part in the decision of the court. However, assuming, without deciding, that the transcript of the second conversation was *Rosario* material and that defense counsel should have been given a copy of the transcript, we nonetheless conclude that the refusal of the court to direct the prosecutor to turn over the transcript of the second conversation did not constitute reversible error.

In *People v Consolazio* (40 NY2d 446, cert den 433 US 914) and *People v Payne* (52 NY2d 743), the Court of Appeals rejected defense arguments that the withholding of *Rosario* material mandated the granting of a new trial. In *People v Consolazio* (*supra,* p 454), the court held that the withheld material was "nothing more than duplicative

equivalents of statements previously turned over to the defense" and that "it was not error to fail to turn over worksheets which would have been cumulative only". In *People v Payne* (*supra,* p 745), the court held that although in the normal course the withheld material "certainly should have been provided along with the other statements by the prosecution witnesses, here the availability of the duplicative material, which in fact was used by the defendant, eliminates both the possibility of prejudice and the asserted ground for reversal".

A similar result is called for in this case. The taped conversation between the witness and defendant's wife (the transcript of which defense counsel received at trial) and the taped conversation between the witness and defendant's stepson which was not given to counsel reveal that the statements made by the witness in both conversations are essentially the same. There is no dramatic, or substantial, difference in them.

In both conversations the witness, acting at the behest of the District Attorney, seeks to elicit confirmation of the fact that the bribe offer made to her was for $500 rather than $170 or $175. The only additional statements the witness makes in the conversation with the stepson are that she will take $500 but not less, and that she wanted the money in order to get an apartment. As we read them, the two conversations are, in essence, the same; that is, they are duplicative and cumulative in nature within the meaning of *Consolazio* (*supra*).

Neither of the conversations contains any mention of defendant's guilt or innocence. Nor do they contain any suggestion that it was Nydia who initiated the talk of a bribe in return for her refraining from testifying. The second conversation in which the witness mentions for the first time the reason for wanting the money hardly allows for the inferences (1) that she solicited the bribe, as defense counsel suggested during cross-examination, and (2) that if she did not receive the money mentioned she would become a hostile witness and give false testimony against the defendant. After examining the transcript of the first conversation which resulted from the District Attorney's urging, defense counsel wisely chose not to pursue the matter

of the alleged bribe any further. We see nothing in the transcript of the second conversation, also a product of the District Attorney's action in the matter, which contains material favorable to the defense, or material significantly different from that of the first conversation, or which would have given defense counsel any avenue of attack on the witness not present in the first conversation. In sum, it is our view that inasmuch as defense counsel had available to him for examination of the witness material which was duplicative of, or cumulative to, that which was withheld, "both the possibility of prejudice and the asserted ground for reversal" are eliminated (*People v Payne,* 52 NY2d 743, 745, *supra;* see, also, *People v Gladden,* 72 AD2d 568; *People v Davis,* 87 AD2d 597). Accordingly, even if the trial court erred in failing to direct the prosecutor to turn over the transcript of this noneyewitness' telephone conversation with the defendant's stepson, that error must be labeled as harmless under *Consolazio (supra).*

The other points advanced by defendant as reasons for reversal are likewise without merit. Hence, we affirm defendant's judgment of conviction.

GIBBONS, J. P. (dissenting). Of primary importance to defendant's appeal is the question of whether his rights under *People v Rosario* (9 NY2d 286) were violated when his attorney was prevented from reviewing a certain prior statement made by a key prosecution witness. In my view, the statement in question does constitute *Rosario* material. Moreover, I have reached the conclusion that this statement is not the duplicative equivalent of another statement which was provided to defendant's attorney and that therefore defendant is entitled to reversal of his conviction and a new trial.

Defendant and one Antonio Calderone were tried and convicted for the murder of Benedicto Muniz, also known as Junior. The homicide took place on September 16, 1977, in the apartment of Nydia Marcano. Defendant is married to Nydia's sister, Suzanna Marcano. Living with Nydia at the time were her two children, Jose and Angel, and two women, Cecilia Matos and Iris Maldonado. Jose, Cecilia, Iris and Nydia testified for the People.

Jose and Cecilia were apparently both eyewitnesses to the crime and testified that defendant shot Junior when he refused to give money to defendant and Calderone. Iris and Nydia were not in the room when the shooting occurred. However, they both testified that when they heard the shots, they came into the room and saw Junior on the floor and defendant with a gun in his hand. Defendant allegedly told both of them to "shut up or I'll kill you".

In May, 1978, some one month prior to trial, defendant's attorney informed the court that members of defendant's family had told him that Nydia had approached them, asking for $500 in return for her nonappearance at the trial. Nydia had allegedly told them that "she wouldn't show up because she knew that he was innocent". Defendant's counsel asked for a hearing as to these allegations. The request was denied at the beginning of trial, the court being of the view that such a matter should properly be pursued through cross-examination. On cross-examination during trial, defendant's attorney asked Nydia whether she had previously solicited a bribe from her sister Suzanna's family for not testifying. She responded that it was members of defendant's family who had approached her with a bribe offer. Specifically, she testified that her sister Suzanna, defendant's brother, known as Nelo, and Suzanna's son, Francesco Sememidey, had come to her house to offer her money. Nydia then went to the Assistant District Attorney handling the case and was instructed to play along with the bribe offer. From a telephone in the District Attorney's office, she called both Suzanna and Francesco. The calls were taped. Nydia testified that she asked Suzanna whether "they were going to give the money". Suzanna told her to call Francesco so that an arrangement could be made for defendant's brother to deliver the cash. Nydia did call Francesco at the factory where he worked. However, she did not hear again from members of defendant's family.

The prosecutor opened his redirect examination of Nydia by asking her about the alleged bribe offer. The trial court instructed the jury that this testimony was only being offered with respect to the credibility of that particular witness and had nothing to do with defendant's guilt or

innocence. The prosecutor, apparently reading from the transcript of the above referred to telephone conversation with Suzanna, asked Nydia whether she remembered saying "Wasn't it $500 he offered me". When defendant's counsel objected, the prosecutor gave him a copy of the transcript. The portion of the transcript to which the prosecutor was referring reads as follows:

NM [Nydia Marcano] Wasn't it five hundred dollars that he'd offered me?

SM [Suzanna Marcano] Ah...

NM Five hundred...

SM I don't know. No back on that day what he took with him was one hundred seventy-five.

NM A hundred and seventy-five?

SM Yeah.

Subsequently, in a colloquy between the court and counsel, which occurred after Nydia stepped down from the witness stand, defendant's attorney asked whether a tape had also been made of the telephone conversation between Nydia and Francesco. The Assistant District Attorney refused to supply that information, whereupon defendant's attorney moved for a court order of production. The application was denied.

The principal defense witness was Carmen Colon, the owner of the building in which the homicide occurred. At the time of the incident, she was visiting the second floor tenant. Hearing shots, she ran downstairs to Nydia's apartment, where she saw Nydia "on the body", screaming. After Nydia got up, she told Carmen that the deceased had killed himself. Carmen then called the police.

The jury convicted both defendants of murder in the second degree and manslaughter in the first degree.

Defendant raises numerous claims on appeal. The principal one is that any written or recorded statement made by Nydia concerning the alleged bribe offer constituted *Rosario* material, which should have been turned over by the prosecution. Furthermore, it is contended that *Brady v Maryland* (373 US 83) is implicated in that some of the material not produced for inspection might bear on Nydia's credibility.

The People argue that the tape-recorded conversations are not covered by the *Rosario* rule "because the subject matter of the tapes was independent of and unrelated to Nydia Marcano's trial testimony concerning the murder of Benedicto Muniz". Further, according to the People "[t]he tapes were clearly not *Brady* material * * * [as] [t]he attempt to bribe the prosecution witness was entirely inculpatory".

Transcripts of the taped conversations have been provided this court by the District Attorney's office. The conversation between Nydia and Suzanna, who is also known as Clara, apparently took place at about 9:45 A.M., on May 18, 1978. The transcript of this conversation was the one given to defendant's counsel at trial. Another transcript, which was not turned over to defendant, is of the telephone conversation between Nydia and Suzanna's son, Francesco. This conversation apparently occurred at about 10:10 A.M. of the same day. The initial question to be resolved is whether these transcripts constitute *Rosario* material.

Simply put, the *Rosario* rule requires the People to provide a defendant an opportunity to examine a witness' prior statement provided the statement "relates to the subject matter of the witness' testimony and contains nothing that must be kept confidential" (*People v Rosario,* 9 NY2d 286, 289, *supra;* CPL 240.45). The purpose of the rule "is to afford the defendant a fair opportunity to cross-examine the People's witnesses at trial" (*People v Poole,* 48 NY2d 144, 149; see *People v Gissendanner,* 48 NY2d 543, 551). Even where the prior statement is in apparent harmony with the witness' trial or hearing testimony, it should be produced for examination by defense counsel (*People v Rosario, supra,* pp 289-290; *People v Gilligan,* 39 NY2d 769). The rule has been refined over the years so as "to ensure that the defendant receives the full benefit of a witness' statements for impeachment purposes" (*People v Poole, supra,* p 149), and applies to statements "no matter what the form and no matter when made" (*People v Cavallerio,* 71 AD2d 338, 344).

It is, of course, true that the failure to turn over written materials which do not bear on the crime charged will not

result in a reversal under *People v Rosario* (*supra;* see *People v Kanefsky,* 50 NY2d 162). However, to maintain, as do the People on appeal, that the taped conversations are not *Rosario* material because they "related only to the suborners attempt to thwart the prosecution of this defendant and not to the crime giving rise to that prosecution" begs the question of Nydia's credibility. Defendant's attorney informed the Trial Judge that he had heard that Nydia had solicited a bribe from members of defendant's family. Counsel never conceded that it was the other way around, and it was for the purpose of possibly inquiring further into this question that defendant's attorney asked if there were other tapes or information available. The transcript of the first conversation with Suzanna indicates that both Nydia and members of defendant's family were interested in an exchange of money. It does not reveal who initiated the idea of a bribe. While, of course, Nydia may have been, in all honesty, playing along with the bribe idea at the request of the District Attorney's office, other possible explanations exist. For example, it may be that Nydia hated defendant enough to contrive a situation whereby it would look like defendant and his family were trying to bribe her, when, in fact, it was she who had made the initial approach. Perhaps she had demanded $500, and when defendant's brother had insisted he could only come with $175, Nydia decided to go to the District Attorney. Given such a possible scenario, the logic of the inquiry by defendant's attorney is obvious (cf. *People v Acomb,* 87 AD2d 1, 8).

Anyone who solicits or even considers taking a bribe to testify or to refrain from testifying is subject to, at least, some measure of doubt (see *People v Acomb, supra,* pp 7-9). The tapes and the transcripts are clearly relevant to this case, not because Nydia spoke of how the homicide occurred, but because, as acknowledged by the trial court, they bear on Nydia's credibility (see *People v Cantone,* 73 AD2d 936). The point of the *Rosario* rule is, again, that a defendant should receive "the full benefit of a witness' statements for impeachment purposes" (*People v Poole,* 48 NY2d 144, 149, *supra*), provided the statements relate to "the subject matter of the witness' testimony" (*People v Rosario,* 9 NY2d 286, 289, *supra*). In this case "the subject

matter" of Nydia's testimony included the alleged bribe offer, whoever originated it. That subject is not collateral to the case, since it relates to a possible motive to falsify on Nydia's part (*People v Acomb, supra,* pp 7-9; see *People v Bruno,* 77 AD2d 922; *People v McIntyre,* 71 AD2d 956, 959-960; Fisch, NY Evidence [2d ed], § 469). The Court of Appeals has recently reiterated the rule that noncollateral matters, such as are involved here, which bear on credibility are admissible (*People v Pavao,* 59 NY2d 282; see, also, 3A Wigmore, Evidence [Chadbourn rev, 1970], §§ 1004, 1005).

Whether Nydia had a motive to lie bears on the guilt or innocence of defendant inasmuch as, not only was she a key prosecution witness, but her alleged statement to Carmen Colon that the deceased had killed himself provided the central claim of the defense. "The relations which a witness has to the case, or to a party, threats made by him, the fact that a party tried to bribe him, the fabrication, destruction or concealment of evidence and the like, may be shown" (*Hoag v Wright,* 174 NY 36, 45-46). As the United States Supreme Court said in a similar context, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence" (*Napue v Illinois,* 360 US 264, 269). Accordingly, both the United States Supreme Court and our Court of Appeals have held that nondisclosure of evidence solely affecting credibility may well come within the *Brady* rule (*Giglio v United States,* 405 US 150, 154; *People v Cwikla,* 46 NY2d 434, 441). Likewise, for the purpose of applying *Rosario (supra),* it is of no consequence that a prior statement bears upon credibility rather than directly upon the circumstances of the crime charged, provided that the substance of the statement is not completely collateral (see *People v Savvides,* 1 NY2d 554, 557). In so concluding, it is not my position that any and all material relating to credibility comes within the *Rosario* rule. We are not here concerned with prior immoral acts, previous convictions of a crime, or some other matter bearing solely upon a tangential aspect of credibility. Rather, the evidence sought to be introduced at bar was relevant to an issue in the case and was independently admissible to impeach the witness (Richardson, Evidence [Prince, 10th ed], § 491; *People v Pavao,* 59 NY2d 282, *supra*).

The transcripts of the tapes contain no privileged material. Since they do bear on the subject matter of Nydia's testimony, as above discussed, both of them should have been turned over to defendant's attorney.

The majority argues that defendant, in effect, waived any right under *Rosario* (*supra*) to the second transcript by making a strategic decision not to ask for the transcript as an aid in the cross-examination of Nydia. This amounts to nothing but conjecture. It is significant that the People on appeal have not even proffered this view. The only reference to "strategy" made by the People is in their supplemental brief and pertains not to whether defendant waived his right to certain *Rosario* material but whether the cross-examination of Nydia resulted in defendant being denied the effective assistance of counsel (see *People v Baldi,* 54 NY2d 137, 146-147). Who is to say that if defendant's attorney had been given the transcript, as he requested, he would not have asked to resume his cross-examination of the witness (see *People v Kegelman,* 73 AD2d 977)? While the attorney did not ask for the transcript until after Nydia stepped down, there is absolutely no reason to assume that the attorney intentionally refrained from making his request until a later time because he did not wish to use the document in questioning Nydia. I have found no case holding that a request for *Rosario* material need not be honored when made after a witness has finished testifying, under some sort of theory of waiver or, as the majority puts it, "strategy". It is significant in this regard that CPL 240.45, enacted after the trial in this case, does not even require defense counsel to move for *Rosario* material in order to make the prosecutor obligated to produce it.

In support of its view of waiver, the majority maintains that defendant's attorney decided not to ask for the transcript for impeachment purposes because it became apparent that "defendant's family had not been honest with defense counsel" and he "had become convinced that he could not shake Nydia on the bribe offer". Again, this is nothing but conjecture. In fact, defendant's attorney told the court in colloquy that he did not "read" the first transcript as demonstrating that Nydia was telling the truth and that defendant's family had initiated the bribe offer.

The majority also maintains that the record of the colloquy between defense counsel and the court reveals that counsel was concerned that the jury had not been made aware of the fact that he was the one who, prior to trial, had brought the story of the alleged bribe offer to the court's attention. If that is so, then why did not defendant's attorney simply ask the court to inform the jury that some one month prior to trial he had called the court's attention to the matter? Patently, there simply was no such request. Moreover, it cannot be successfully argued that the transcripts were requested out of fear that they might be used against Francesco in the event that he was called upon to testify. Francesco did ultimately testify for the defense, and while the majority finds it significant that "defense counsel never questioned him on the subject of the alleged bribe", the foregoing is, in my view, unremarkable considering that defense counsel had reason to believe that the People had a transcript of a conversation between Francesco and Nydia on this subject which they would not turn over and which the court refused to order produced. What is remarkable is that when the People conducted a vigorous cross-examination of Francesco, not once was the latter asked if he had participated in an attempt to bribe Nydia. I would suggest that it was not defendant's attorney, but the prosecutor who purposefully stayed clear of the subject of Francesco and Nydia's conversation so that the contents of that conversation would not become known to defendant's attorney and, perhaps, to the jury.

The majority also makes much of the fact that, in his summation, defendant's attorney did not mention the testimony about a bribe offer. This is of no significance. I do not dispute that Nydia's testimony on this subject hurt the defense. Defendant's attorney would have been foolish to emphasize this issue in his summation, with the jury's knowledge of the matter being limited to Nydia's testimony. That is the whole point. If defendant's attorney had had the transcript of the conversation between Nydia and Francesco, who is to say what he might have been able to accomplish with respect to her credibility? Then we might have seen a very different summation.

It is further argued by the majority that, somehow, defendant's own *pro se* appellate brief bears on the question of what his trial lawyer's intent was with respect to his request for the second transcript. Specifically, attention is drawn to defendant's displeasure with his trial attorney and the attempt to delve into the bribe question at all. The majority states that this shows that defendant "realized full well that the bribe testimony was not helpful on the issue of Nydia's credibility and may have damaged whatever slim chance he had for acquittal", and that "he does not feel aggrieved because his counsel was not afforded the right to question Nydia with respect to the contents of the second tape". The latter assertion is a *non sequitur*. In fact, at one point in his *pro se* brief defendant does complain that "[d]efense counsel was never made aware of the alleged tape recorded conversation, prior to the trial". As for the former assertion, again, I argue that Nydia's testimony, as it stands, without benefit of the withheld transcript, was not helpful to the defense, at least with respect to the question of who tried to bribe whom. The issue is, however, whether defendant's attorney had a full and fair opportunity to question Nydia's credibility when he was refused access to the transcript of her conversation with Francesco. If defense counsel had access, he could have recalled Nydia to the stand, and the record of her testimony might have been very different. That is what the *Rosario* rule is all about. Had the second transcript been turned over, there would be no room for the type of speculation indulged in by the majority.

Contrary to the views expressed by my colleagues, the record of the colloquy between the court and the attorneys shows that defendant's attorney was very concerned about Nydia's credibility. After asking if there were a tape and a transcript of the call that Nydia said she made to Francesco, and after defendant's attorney debated with the court about how to interpret the first transcript, the following exchange occurred:

MR. HIRSHMAN [defendant's attorney]: * * * But I think there is a difficulty in attacking the credibility if this is all it goes to, if there is an allegation by this witness from the stand that she made a call to the factory to the stepson of the family, as to whether or not that call was made —

MR. CALLAN [the prosecutor]: Your Honor, what is counsel suggesting?

MR. HIRSHMAN: What I am suggesting is, if this is the only call. that there is even more grounds to believe that it was done as an entrapping, so that this could not be used as an issue to attack him on.

MR. CALLAN: What is your position sir? Are you moving to do something?

MR. HIRSHMAN: I am moving to find out what information the District Attorney has with respect to her testimony. I wouldn't know it.

The first remarks by defendant's attorney certainly indicate that he was interested in attacking Nydia's credibility. He stated that it was difficult to do this if he couldn't even receive documented confirmation that the call to Francesco had been made. The second remark by defendant's attorney reflects his concern that if, in fact, only one call had been made, the one to Suzanna, then it would confirm his belief that the call was a pretense on Nydia's part, to cover her true intent. The third remark is, of course, the unequivocal request for the transcript.

In sum, despite the fact that the request for the transcript may have been late, there is no reason on this record to suppose that defendant waived his rights under *Rosario* (*supra*).

The next issue to be resolved is whether, in the circumstances of this case, the failure to give defendant's attorney a copy of the second transcript requires a reversal. Guidance on this question is provided by *People v Consolazio* (40 NY2d 446, cert den 433 US 914). In that case the prosecutor turned over to defense counsel the Grand Jury testimony of various witnesses but did not provide certain interview notes made by an Assistant District Attorney in preparation for trial. After holding that the interview notes came under the *Rosario* rule, the Court of Appeals, in a unanimous decision written by Judge Jones, noted (pp 454-455):

"Turning then to whether the withholding of such worksheets must here result in the setting aside of defendant's conviction, we conclude not in the circumstances of this case. We hold, of course, that a failure to turn over *Rosario* material may not be excused on the ground that such material would have been of limited or of no use to the defense, or that a witness' prior statements were totally

consistent with his testimony at trial. (*People v Malinsky,* 15 NY2d 86, 90-91; *People v Paige,* 48 AD2d 6; cf. *People v Zabrocky,* 26 NY2d 530, 536-537; *People v West,* 29 NY2d 728; *People v Peacock,* 31 NY2d 907; *People v Sanders,* 31 NY2d 463.) *We thus reject arguments that consideration of the significance of the content or substance of a witness' prior statements can result in a finding of harmless error.*

"The present case, however, presents a significantly different issue. Our examination of the Grand Jury testimony of the various prosecution witnesses (which testimony was turned over by the prosecutor to the defense) reveals that the witnesses' statements contained in the worksheets were the same as the statements made by such witnesses before the Grand Jury. *The worksheets in this instance were nothing more than duplicative equivalents of statements previously turned over to the defense — the only difference being as to the particular form in which such statements were recorded. In this circumstance it was not error to fail to turn over worksheets which would have been cumulative only.* (Compare *People v Kass,* 25 NY2d 123, 127.)

"In reaching the conclusion that we do in this case we make a supplemental observation. When *Rosario* material is requested by a defendant, in the ordinary situation it should be of negligible practical significance whether on comparative examination such material would or would not prove to be equivalent duplication of material already in the defendant's possession. On the one hand, if inspection were to lead to the conclusion that the material sought was a counterpart of other material already possessed by the defendant, the prosecutor would have infrequent occasion to object to its disclosure. On the other hand, if examination were to disclose that it was not a duplicative equivalent, then, of course, the defendant would be entitled to full disclosure. Reflection thus suggests that once it is determined that the writings sought by the defendant come within the *Rosario* rule, the better practice would be to direct a turnover forthwith. No sufficiently useful purpose would appear to be served by engaging in a collateral analysis as to whether the defendant would or would not be technically entitled to disclosure" (emphasis supplied).

In a footnote to its statement that "[w]e thus reject arguments that consideration of the significance of the content or substance of a witness' prior statements can result in a finding of harmless error" (p 454) the court made this observation: "To be distinguished are those appeals from pre-*Rosario* convictions as to which this court applied a harmless error analysis where violations of the *Rosario* rule were found. (See, e.g., *People v Rosario,* 9 NY2d 286, 291, *supra; People v Hernandez,* 10 NY2d 774; *People v Turner,* 10 NY2d 839; *People v Fasano,* 11 NY2d 436; *People v Hurst,* 10 NY2d 939; *People v Pereira,* 11 NY2d 784; *People v Hawa,* 13 NY2d 718, *supra; People v Horton,* 18 NY2d 355, *supra;* for a statement to this effect see *People ex rel. Cadogan v McMann,* 24 NY2d 233, 237.)"

The above-quoted language from *Consolazio (supra)* is straightforward and unequivocal; a harmless error analysis is not to be engaged in where there has been a *Rosario* error (see *People v Mattiace Inds.,* 52 NY2d 739). However, because decisions from the Appellate Divisions do not uniformly recognize the significance of this (compare, i.e., *Matter of John G.,* 91 AD2d 685; *People v Baker,* 75 AD2d 966; *People v Cadby,* 75 AD2d 713; *People v Flores,* 57 AD2d 783, with *People v Confer,* 73 AD2d 785; *People v Gladden,* 72 AD2d 568; *People v Beal,* 57 AD2d 306), and because of the fact that, generally, errors are subject to a harmless error analysis, I consider it appropriate to explore the matter further (see *People v Daly,* 98 AD2d 803, 805-808 [dissenting opn of Lazer, J.]).

Except in situations of fundamental error, affecting the defendant's right to a fair trial, it can generally be said that harmless error analysis proceeds in two stages (see *People v Johnson,* 57 NY2d 969; *People v Crimmins,* 36 NY2d 230, 237-242). First, any error, whether of constitutional dimension or not, will be deemed to be prejudicial and will require reversal unless the proof of guilt is overwhelming (*People v Crimmins, supra,* pp 241-242). If the proof of guilt is overwhelming, the appellate court is to proceed to the next stage. The second stage is divided into two standards, the application of which depends on whether the error or errors were of constitutional dimension or not. Under the standard for constitutional error,

even if the proof of guilt is overwhelming, the error will only be deemed harmless if "there is no *reasonable possibility* that the error *might* have contributed to defendant's conviction" (*People v Crimmins, supra,* p 237; emphasis supplied). Under the standard for nonconstitutional error, there will be a reversal even in the face of overwhelming evidence of guilt if "there is a significant probability, rather than only a rational possibility, in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred" (*People v Crimmins, supra,* p 242).

While setting forth in *Crimmins (supra)* a framework for harmless error analysis, the Court of Appeals in that case, through the opinion of Judge Jones, recognized that there were "special instances" where, particularly for "therapeutic purposes", a harmless error analysis should play no part (*People v Crimmins, supra,* p 240, n). As explained in *Consolazio (supra),* also written by Judge Jones, errors involving *Rosario* material present an instance where such a strict therapeutic rule is, if not absolutely necessary, at least beneficial. Long before *Consolazio (supra),* the Court of Appeals held that "the judge presiding may not allow the People to keep from the defendants' counsel statements or notes made by a witness upon the ground that nothing in them could assist the defense or that no prejudice would result from withholding them" (*People v Malinsky,* 15 NY2d 86, 90-91). Relevancy alone is the key: the use to be put to a prior statement is to be decided by defense counsel, not the court. "[E]ven the sound discretion of the Trial Judge exercised in an *in camera* review to determine the utility of such statements is an inadequate substitute for the single-minded zeal of a defense attorney seeking to protect his client's right to test the credibility of the People's witnesses. (*People v Gilligan,* 39 NY2d 769, *supra.*)" (*People v Poole,* 48 NY2d 144, 149, *supra.*) If a harmless error analysis were allowed, this principle, firmly established in *Rosario (supra)* itself and elaborated on in *Malinsky (supra), Gilligan (supra),* and *Poole (supra),* could be undermined. A Judge or District Attorney could look at the material, decide it would not significantly benefit the defense and refuse to turn it over, knowing that on appeal any error would probably be considered harmless.

Besides the reference in *Crimmins* (*supra,* p 240, n) to "special instances", where, for "therapeutic purposes", a harmless error analysis is irrelevant, the *Crimmins* case sheds light on *People v Rosario* (*supra*), and *People v Consolazio* (*supra*), in another respect. According to the above-quoted footnote from *Consolazio* (*supra,* p 454), a harmless error analysis was applied for trials predating the decision in *Rosario* (*supra*). *People v Rosario* (9 NY2d 286, 290-291, *supra*) itself confirms this. In *Rosario* (*supra*), the Court of Appeals applied the strict standard applicable to an error of constitutional dimension in determining whether the error was harmless (see, also, *Goldberg v United States,* 425 US 94, 111, n 21; *United States v Knowles,* 594 F2d 753, 755, for discussions of harmless error under the Jencks Act [US Code, tit 18, § 3500]). If harmless error could apply here, we would have the task of deciding whether, irrespective of any overwhelming proof of guilt, there is any reasonable possibility that the error might have contributed to defendant's conviction; or to put it another way, is there any reasonable possibility that, but for the error, the jury might have acquitted the defendant? Such an analysis, of necessity, requires an examination of the nature and significance of the error. Yet, as to *Rosario* errors, the Court of Appeals in *Consolazio* (*supra,* p 454) stated "[w]e * * * reject arguments that consideration of the *significance of the content or substance* of a witness' prior statements can result in a finding of harmless error" (emphasis supplied). In effect, the Court of Appeals has stated that an appellate court may not involve itself in the second stage of a harmless error analysis where the error involved is a violation of *Rosario* (*supra*), for the therapeutic reasons already discussed.

While in *Consolazio* (*supra*), the Court of Appeals did not apply a harmless error analysis, it, nonetheless, did not reverse the defendant's conviction despite the failure to turn over the Assistant District Attorney's interview notes. The reason was that while the interview notes should have been provided, they were the duplicative equivalents of the Grand Jury testimony which had been turned over to defense counsel (see *People v Payne,* 52 NY2d 743). Thus, in this case, it is necessary to determine

whether the two transcripts are the duplicative equivalent of each other (*People v Martinez,* 96 AD2d 516). Since copies have been provided this court, I have conducted that comparison (see *People v Consolazio, supra,* p 454) and conclude that they are not duplicative equivalents. Accordingly, a reversal is required (see *People v Baker,* 75 AD2d 966, *supra*).

It is true that elements of both conversations indicate that a bribe was offered to Nydia which she was considering accepting. However, portions of the second conversation suggest, as maintained by defendant's trial attorney, that Nydia's role in the whole business may have been far from passive. The following exchanges occurred between Nydia and Francesco:

NM [Nydia] How much is he gonna give me?

FS [Francesco] Well, that time back then he was gonna give you a hundred and seventy.

NM A hundred seventy? Wasn't it five hundred?

FS I don't know. He had a hundred seventy.

NM *Because I want the money in order to get an apartment.*

FS Aha. Can I come see you?

NM Come to the house?

FS And then to speak to him. If he gives you the money, I'll bring it over to you Friday * * *

NM Oh. *If he offers me five hundred, I'll take it. If not, I won't* (emphasis supplied).

No comparable statements showing such an active solicitation on Nydia's part are found in the first conversation. It is not for this or any other court to say that defendant's attorney would not have been able, in the course of a vigorous cross-examination, to use these additional remarks made by Nydia to impeach her story, particularly with regard to her testimony about the bribe offer.

Since I am compelled to vote for a reversal of defendant's conviction and to grant him a new trial because of the *Rosario* error, it is not technically necessary to consider the further question of whether a reversal would also be required under the principles of *Brady v Maryland* (373 US 83, *supra*). However, it is necessary to comment briefly on

this issue due to the majority's observation that "the subject transcript is not exculpatory material within the purview of *Brady v Maryland* (373 US 83) and *People v Simmons* (36 NY2d 126) * * * [because] [n]owhere in either transcript is there any statement made by Nydia Marcano which suggests, even remotely, that the defendant was innocent of the crime and was being falsely accused".

The *Brady* rule provides that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" (*Brady v Maryland, supra,* p 87). As mentioned earlier in this opinion, both the United States Supreme Court and our Court of Appeals have considered the question of whether disclosure of evidence is required under *Brady* (*supra*), where that evidence concerns credibility but does not pertain directly to the circumstances of the crime (*Giglio v United States,* 405 US 150, *supra; People v Cwikla,* 46 NY2d 434, *supra*). A classic example of such evidence is the existence of an agreement between the prosecution and a witness. Considering such a case in *People v Cwikla* (*supra*), the Court of Appeals held that *Brady* (*supra*) was implicated because an agreement between a witness and the People could provide a motive to lie.

It has already been demonstrated in the context of the *Rosario* discussion, that the bribe offer episode in this case might have involved a motive for falsification on Nydia's part. Thus, it cannot be summarily held that *Brady* (*supra*) is not applicable. However, a full explication of the issue is complex because, in the context of a *Brady* (*supra*) analysis, the prerequisite of materiality has various facets not applicable when analyzing a *Rosario* problem (see *United States v Agurs,* 427 US 97). In particular, materiality under *Brady* (*supra*) involves, among other things, the specificity of the defendant's request, if any, for evidence, and the prejudice, if any, arising from the failure to turn over the evidence (*United States v Agurs, supra;* see *People v Andre W.,* 44 NY2d 179; *People v Kitt,* 86 AD2d 465). The latter facet is particularly interesting, highlighting a major difference between *Brady* (*supra*) and *Rosario* (*supra*).

In effect, under *Brady* (*supra*), a harmful error analysis is subsumed with the notion of materiality, whereas under *Rosario* (*supra*), as already seen, such an analysis plays no part. Inasmuch as I would, in any event, reverse defendant's conviction on the *Rosario* issue, it is not necessary to conclusively resolve the *Brady* question.

I, therefore, vote to reverse and order a new trial.

BRACKEN and BROWN, JJ., concur with NIEHOFF, J.; GIBBONS, J. P., dissents and votes to reverse the judgment and order a new trial, with an opinion.

Judgment of the Supreme Court, Kings County, rendered July 28, 1978, affirmed.