THE PEOPLE OF THE STATE OF NEW YORK, Respondent-Appellant, v CHARLES BRUCE ACOMB, Appellant-Respondent.

Fourth Department, May 21, 1982

APPEARANCES OF COUNSEL

*Lipsitz, Green, Fahringer, Roll, Schuller & James (Herald Price Fahringer* of counsel), for appellant.

*Theodore E. Wiggins, Jr.,* for respondent.

OPINION OF THE COURT

DILLON, P. J.

Defendant stands convicted of manslaughter in the first degree for the shooting slaying of his nephew. Two of the errors asserted on appeal were of such dimension that defendant was denied a fair trial. The trial court erred in permitting a witness to testify to statements of the victim

made at the scene of the shooting indicating that the defendant was the perpetrator. It was also error to deny defendant's motion to strike the testimony of a prosecution witness who testified on direct examination to an admission by defendant but who took refuge in his right against self incrimination and refused to answer questions on cross-examination concerning his alleged pretrial solicitation of $10,000 to absent himself from the trial. Since there must be a reversal and a new trial, we also hold that the trial court did not err in excluding testimony of other statements made by the victim which the People claim were "excited utterances" in one instance and "dying declarations" in another.

On November 11, 1978 at approximately 12:30 A.M., the defendant and the victim, William Bradley DeLavergne, were involved in an argument in a bar in Dansville, New York. At one point the defendant asked DeLavergne to "get out back" to settle the argument. DeLavergne refused, and what was otherwise said in the course of the argument is not known. Upon intervention by a third party, defendant calmed; he left the premises between 12:45 and 1:30 A.M.

Although Nicholas Mark, a friend of DeLavergne's, was present in the bar during the argument between defendant and DeLavergne, he did not hear the conversation between them. Mark and DeLavergne left the premises together at about 2:15 A.M.

Mark testified that at approximately 2:30 A.M., as he drove his car northerly on Route 63 with DeLavergne as his passenger, he saw defendant's pickup truck entering Route 63 from defendant's farm. He did not identify defendant as an occupant of the truck, which he followed as it proceeded along Route 63 and thence along Everman Road to a point where he drove his car from the road into the headlands of a cornfield, stopping behind defendant's already parked truck.

The record thereafter recounts Mark's direct testimony and the attendant colloquy as follows:

"Q. What happened next, please?

"A. I pulled in and stopped and Brad opened the door and got out, and with my door open, stood beside the car and looked around for Bruce.

"MR. MERBERG: I object to that. I don't know how he can know what the man was doing — and ask that it be stricken and the jury told to disregard.

"MR. WIGGINS: I would oppose.

"MR. MERBERG: It is a conclusion on this witness' part. He said one minute before, he didn't see anybody and he said he got out looking for somebody.

"A. Brad got out looking for Bruce.

"THE COURT: Yes. The objection is overruled. Go ahead.

"MR. MERBERG: Note my exception.

"Q. You can continue, sir.

"A. Brad got out and hollered —

"MR. MERBERG: Objection, your Honor.

"THE COURT: Overruled. Continue

"Q. Go ahead, Mr. Mark.

"A. He hollered for Bruce and Bruce did not appear. So, he stood there a minute looking around and asking for Bruce, and Bruce didn't show. So, he got back in my car and shut the door and he said —

"MR. MERBERG: Objection as to what he said.

"THE COURT: Overruled.

"MR. MERBERG: That is not in the presence of —

"THE COURT: I understand your objection. Overruled. You may continue, Mr. Mark.

"A. He said that 'we were to meet here and Bruce is here', he says —

"MR. MERBERG: May we approach the bench, your Honor?

"THE COURT: No. Your objections are noted, Mr. Merberg. Continue, sir.

"A. 'He was to meet me here and he's here someplace' but he says, 'he'll probably shoot me if I get back out there.'

"MR. MERBERG: Objection. May we approach the bench, again, your Honor?

"THE COURT: Please sit down. Your objections are continually noted.

"Q. Would you continue?

"A. And I said to him, 'well, if you think he's going to shoot you, let's go and —

"MR. MERBERG: Your Honor, I have a continuing line of objection to this.

"THE COURT: I understand you do.

"MR. MERBERG: Thank you, your Honor.

"A. — so I told him, 'Brad, let's go. You can tell Bruce you were here and that'll be all there would be to it.' He says, 'he's got to be here' and so he says, 'he's got to be here laying in the truck, laying down.' He got back out of the car, shut the door, went over to the back of the pick up truck, got on the bumper so he could see around better, and jumped up and down on the bumper a couple of times, so if Bruce was in there, he'd come out, and no one appeared. So, he stepped off the bumper on the ground, and when he stepped on the ground there was a shot.

"Q. I'm sorry, sir, when he stepped on the ground there was a shot fired? I'm sorry, sir, when he stepped on the ground?

"A. When he stepped on the ground, there was a shot fired.

"Q. Are you familiar with guns?

"A. From a high-powered gun.

"Q. Are you familiar with guns? In the past, have you been around them or heard them?

"A. I have a shotgun of my own.

"Q. You have heard guns fired in the past?

"A. Yes. It was a loud shot.

"Q. I'm having trouble hearing you?

"A. It was a loud shot.

"Q. What happened then?

"A. Brad grabbed his stomach and said, 'he shot me.'

"MR. MERBERG: Objection."

Mark fled the scene, leaving DeLavergne lying on the ground. He drove home and went to bed without reporting the incident. On cross-examination he admitted that he did not see the defendant at any time after the defendant left the bar.

## I

■ On these facts, our first inquiry is whether, as claimed by the People, Mark's testimony of the victim's statements made at the scene of the shooting were admissible as "verbal acts". They were not.

Analysis begins with the familiar observation that the hearsay rule prohibits the use of statements made out of court when offered to prove the truth of facts asserted in the statement (*People v Settles,* 46 NY2d 154, 166; *People v Caviness,* 38 NY2d 227, 230; Richardson, Evidence [Prince, 10th ed], § 201). A verbal act does not offend the hearsay rule because it is not offered to prove the truth of the statement. It is admissible because it accompanies otherwise ambiguous conduct and lends significance to it. "[A]s a verbal part of the act" its purpose is to explain the conduct (6 Wigmore, Evidence [Chadbourn rev], §§ 1768, 1772; see, also, *People v Sostre,* 70 AD2d 40, affd 51 NY2d 958).

In order to qualify as a verbal act, and thus not hearsay, the conduct to be characterized by the attendant words must be independently material to the case, must be equivocal, and the statements must aid in giving significance to the conduct (*United States v Day,* 591 F2d 861, 882; *People v Sostre, supra;* 6 Wigmore, Evidence [Chadbourn rev], §§ 1773-1776). There is no question here that DeLavergne's presence and conduct at the scene of the shooting were a material part of the case and his spoken words accompanied his conduct. There was nothing equivocal about his conduct, however; it was complete in and of itself and required no further explanation (see *Commonwealth v Chance,* 174 Mass 245).

Moreover, DeLavergne's statements were "not wholly incidental to the conduct" (*United States v Day,* 591 F2d 861, 882, *supra*); they went far beyond lending significance to his acts. Although the People claim that DeLavergne's statements were not offered for the truth of their content, their clear purpose and effect was to accuse the defendant of being present at the scene by prearrangement with DeLavergne and of lying in wait to ambush his victim. The inescapable inferences flowing from such highly prejudicial hearsay should not be received under the pretext of

"elucidating" conduct which was already complete (6 Wigmore, Evidence [Chadbourn rev], § 1775). A reversal is required solely on this issue.[1]

One final observation is necessary. For reasons which will later appear, DeLavergne's statement "He shot me", though hearsay, is admissible as an excited utterance made in response to a startling event (see *People v Edwards,* 47 NY2d 493).

## II

■ Defendant's right to a fair trial was further eroded by other error which may not be viewed as harmless. Immediately upon DeLavergne's death on November 3, 1979, the defendant was incarcerated in the Livingston County Jail. Norman Fountaine, a "trustee" inmate of the jail, testified that on November 5, 1979 he overheard the defendant mumble "I didn't mean to kill him." On cross-examination Fountaine invoked his Fifth Amendment right to refuse to answer questions concerning whether he solicited a $10,000 bribe from a defense investigator in exchange for his agreement not to testify at the trial (see Penal Law, § 215.05). The court denied defense counsel's motion to strike Fountaine's direct testimony.[2]

A defendant has a fundamental right to confront witnesses against him (*Douglas v Alabama,* 380 US 415) and a witness, of course, has the right to invoke his constitutional protection against self incrimination (*Alford v United States,* 282 US 687, 694). A defendant is deprived of the right of confrontation "when a witness testifying to substantial matters against [him] hides behind the shield

1. The record does not support defendant's argument that the trial court premised admissibility of Mark's testimony upon the "state of mind" exception to the hearsay rule. Were we to address that issue we would find the exception inapplicable (see *Clark v United States,* 412 A2d 21 [DC App]).

2. Fountaine's exercise of his Fifth Amendment privilege came as no surprise to the court or the parties. Before Fountaine took the stand, the question of whether he should be allowed to testify was argued out of the presence of the jury. Defense counsel informed the court that Fountaine would be cross-examined on the subject of the bribe offer for the purpose of showing bias, prejudice and lack of credibility. Fountaine's personal attorney responded that his client would invoke the Fifth Amendment if questioned about the alleged bribe. The court ruled that on the basis of what it had heard from all counsel, a motion to strike the direct testimony of Fountaine would be denied.

of the privilege against self incrimination when cross-examined" (*People v Schneider*, 44 AD2d 845 [dissenting memorandum, HOPKINS, Acting P. J.], revd on dissenting memorandum below 36 NY2d 708). The confrontation clause is not offended, however, if the unanswered questions are completely collateral, relating solely to the credibility of the witness and not at all to the subject matter of the witness' direct examination (*Fountain v United States*, 384 F2d 624, cert den *sub nom. Marshall v United States*, 390 US 1005; *United States v Cardillo*, 316 F2d 606, cert den 375 US 822). Conversely, when the restriction upon cross-examination goes beyond the exclusion of purely collateral matters, the testimony of the witness on a related subject must be stricken (*People v Farruggia*, 77 AD2d 447). It is well settled that there can be no restriction upon cross-examination which "can deprive a defendant of an important means of combating inculpatory testimony or at least demonstrating the existence of a reasonable doubt as to guilt" (*People v Gissendanner*, 48 NY2d 543, 548, citing *Davis v Alaska*, 415 US 308, 315-317 and *Douglas v Alabama*, 380 US 415, 418, *supra*).

The subject matter of Fountaine's direct testimony was substantial, relating as it did to defendant's commission of the homicidal act. The issue of whether defendant fired the fatal shot was vigorously contested at trial and defendant's attack upon the quality of the People's proof in that regard was the essence of his defense.

We are not here concerned with precluding cross-examination on a topic bearing but generally on the witness' credibility, as is the case when prior criminal acts, unrelated to the crime charged, are the subject of interrogation. Here the defendant sought answers bearing directly on the issue of whether Fountaine was criminally motivated when he first offered evidence of defendant's admission. One of the questions he refused to answer was: "When did you get the idea for the ten thousand dollars?" Given Fountaine's history of criminal conduct and his status as defendant's fellow jail inmate when the admission is said to have been made, the logic of defense counsel's line of inquiry is readily apparent. It is sufficient to note in resolving this issue that the subject of whether Fountaine

conceived the scheme to solicit a bribe before informing the authorities and the Grand Jury of defendant's admission is not one which may be viewed as collateral to the admission itself. By refusing to respond to cross-examination, Fountaine deprived defendant of an essential means of undermining the impact upon the jury of Fountaine's direct testimony. Defendant was thus foreclosed from exercising his right of confrontation as to a substantial matter, and the trial court erred in denying his motion to strike Fountaine's testimony.[3]

### III

To respond to the People's argument that the trial court erred in excluding testimony of DeLavergne's "excited utterances", we revert to the facts. After his abandonment by Mark at the scene of the shooting, DeLavergne made his way to the Everman Road where at about 3:00 A.M. he was discovered by two coon hunters, Russell Schultz and Wilson Ribble. The People sought to prove that as Schultz and Ribble approached DeLavergne, he said, "Help me, I have been shot, Bruce Acomb shot me."

Excited utterances, often characterized as spontaneous declarations, are admissible as an exception to the hearsay rule (*People v Edwards,* 47 NY2d 493, *supra; People v Caviness,* 38 NY2d 227; *People v Del Vermo,* 192 NY 470). Excited utterances are regarded as trustworthy because they are precipitated by a startling event and made in such proximity to the startling event that the declarant lacks the reflective capacity necessary for fabrication (*People v Edwards, supra*). Whether the utterance was made with the requisite spontaneity, i.e., with lack of opportunity for reflective capacity, is for the trial court to determine (*People v Marks,* 6 NY2d 67). Here the trial court found that the statements made by DeLavergne to Schultz and Ribble lacked spontaneity. Not only was there a temporal lag between the shooting and the making of the statements, but DeLavergne evidenced reflective capacity by removing himself from the somewhat remote scene of the shooting to the public highway. Under those circum-

---

3. In so holding, it is noted that the District Attorney is not necessarily foreclosed from offering Fountaine's testimony on a new trial (see CPL 50.30).

stances, it cannot be said that the trial court erred in excluding the statements (*People v Sostre,* 70 AD2d 40, affd 51 NY2d 958, *supra; People v Marks, supra*).

## IV

The trial court also refused to receive into evidence testimony of certain statements made by DeLavergne which the People characterize as "dying declarations". DeLavergne was taken by Schultz and Ribble to the emergency room at Noyes Memorial Hospital. On arrival shortly after 3:00 A.M., he was in shock, his pulse was rapid and weak, his blood pressure was low and he was short of breath. To two nurses and a technician he repeated several times "Please don't let me die" and "I do not want to die". In statements made separately to one of the same nurses, to the same technician and to a police officer, he said that he had been shot by the defendant. To his father he said "Dad, am I going to die? Uncle Bruce shot me. I saw that son of a bitch. Don't do anything foolish. Let the law take care of it. We have a lot of corn to pick." When taken into the operating room, he said to a doctor assisting in the surgery "I am dying", "Doctor, don't let me die" and "Am I going to die?" Following serious emergency surgery, DeLavergne survived for almost a year.

Dying declarations are admissible in homicide cases as an exception to the hearsay rule on the theory that the "fear of impending death is at least as conducive to producing the truth by a declarant as is an oath to tell the truth" (*People v Liccione,* 63 AD2d 305, 316, affd 50 NY2d 850). Admissibility of a dying declaration is conditioned in part upon a showing that the declarant senses impending death and has no hope of recovery (*People v Liccione, supra; People v Ludkowitz,* 266 NY 233). It may not fairly be said here that DeLavergne's declarations in the hospital on the morning of the shooting were made while he sensed impending death and despaired of continued life. On the contrary, his statements, while bespeaking fear of death, did not reflect a certainty of belief that he was about to die. Indeed, his statement to his father indicated an expectation of recovery. Testimony concerning the statements was thus properly excluded by the trial court.

Finally, we perceive no need to review defendant's other claims of error, none of which is of significant merit.

Accordingly, the judgment should be reversed and a new trial granted.

SIMONS, DOERR, MOULE and SCHNEPP, JJ., concur.

Judgment unanimously reversed, on the law and facts, and a new trial granted.