■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GUILLERMO RIVERA, Appellant.—Judgment, Supreme Court, Bronx County (Joseph A. Cerbone, J., at hearing, trial and sentence), rendered May 12, 1988, which convicted defendant of assault in the first degree and sentenced him to an indeterminate sentence of 10 years to life imprisonment, unani-

mously reversed, on the law, and the matter remanded for a new trial.

The essential issue in this one-witness case was the identity of the perpetrator, allegedly defendant, who, while convicted of assault in the first degree, was acquitted of the two related counts of robbery in the first degree. Because, *inter alia,* the court failed to instruct the jury that it could not speculate that defendant was the person who made numerous anonymous threats to the complainant and that these nonattributed threats could not be used as evidence of defendant's consciousness of guilt, we now reverse.

The underlying facts of the case at bar are not complex. On March 1, 1987, at 6:15 P.M., the complainant, one William Felix, a self-confessed heroin dealer, addict, felon and parole violator, was walking down the street with his girlfriend when a man, allegedly defendant, a woman, and, possibly, three other men approached him. Felix, who had snorted heroin within the past two hours, nevertheless recalled at trial that the streets were well lit by streetlamps. Felix claimed he had previously seen the man, to whom he referred as "Willie Green Eyes", and the woman, who Felix presumed to be his wife, as many as four times in the three months prior to the incident.

The man asked Felix for a $5 loan; Felix contended that he readily assented to lend the money, but, because he had nothing less than a $20 bill, told the would-be borrower that he wanted to go into the local store to make change. At that point, the assailant grabbed Felix around the neck from behind and stabbed him in the back with a knife. Felix was then shoved against a wall and a demand was made for his money. He gave the woman $200 and, although the man appeared to be about to stab him again, the woman prevented him from doing so.

Felix fled the scene and collapsed a few blocks away. One Willie Pagan, a friend of Felix, then brought him to Lincoln Hospital. He remained unconscious for four days. His injuries were of such a life-threatening nature that one of his kidneys had to be removed. In all, Felix spent some 17 days in the hospital.

Felix was not interviewed by the police when he first regained consciousness. Rather, based upon information given by Pagan, the police were, from the outset, conducting an investigation of the incident, which they considered to be an assault by an unknown assailant. Later, based upon a conver-

sation with Felix's brother-in-law, the police reclassified the incident as a robbery-assault by an unknown perpetrator.

On March 12, 1987, 12 days after he entered the hospital, Felix observed, from his own hospital room, the defendant herein, prone on a stretcher. Defendant was, on that date, admitted to Lincoln Hospital with gunshot wounds. Ironically, defendant was placed in the very next room by his female companion and a nurse. Felix then told another nurse, as well as hospital security, that defendant was the man who stabbed him. Over the following four days police spoke with Felix in the hospital and arrested defendant.

On April 8, 1988,[1] Felix testified at a pretrial hearing that he had never seen defendant before, nor did he know him either by sight or by name. When the hearing was reconvened three days later, after the weekend, Felix testified that he had, in fact, recognized defendant as his attacker but had testified to the contrary because "I was scared and I was threatened again. This is the second time my life has been threatened." Felix went on to say that his life had been threatened in regard to his testimony on the instant case. Because he was incarcerated, he had to be repeatedly moved between the Bronx House of Detention and Rikers Island, where he was ultimately put in protective custody after he was again threatened. He did not attribute the threats to defendant, or indeed, to any specific source.

Felix was the sole occurrence witness to testify at trial. In sum and substance, he testified to the incident and his identification of defendant as detailed above.[2] Defense counsel elicited that Felix, who had been incarcerated for a parole violation of an underlying first degree robbery, had been released to parole supervision during the course of the trial. However, Felix flatly denied bragging to other prisoners that he would be released early because he "put away [defendant] as promised" or "[kept] his word to the district attorney."

When Felix was confronted with the fact that he initially failed to identify defendant at the pretrial hearing, he testified that this was because he had received threats on his life. He further testified that he changed his testimony only after the Department of Correction moved him.

---

1. While the briefs refer to a hearing on April 8 and 11, 1987, this appears to be the result of a typographical error in the record, which reflects that the hearing and trial took place, consecutively, in April 1988.

2. However, Felix also testified to the presence of three additional men at the scene of the incident, men who were allegedly companions of the assailant.

It is noteworthy that at neither the hearing nor trial did Felix attribute the litany of threats he received to defendant. The court, however, failed to so instruct the jury. The People correctly observe in their brief that defense counsel vigorously argued that Felix's testimony was incredible and also made reference to Felix as "sandwiched between" two police officers, who were acting as armed court escorts. While this may have invited some comment, the depth and breadth of the prosecutor's comments were impressive. Moreover, the prosecutor's summation and comments made by the court itself seemed to invite speculation by the jury that defendant had, in fact, made the threats upon Felix's life.

Almost from the outset, the prosecutor repeatedly referred to the threats and fear and described Felix as "scared to death" of testifying against defendant. She immediately added, "there [are] a lot of things which you cannot know about. There are a lot of things that you cannot speculate about."

The prosecutor placed the focus on Felix's fear again later in her summation: "This man was scared to death. He was still attached to pieces of hospital equipment *[sic]* running to the nurse's station to get the hospital police down there. Petrified. There is nothing casual about it. William Felix in coming to court with nothing to gain and had a lot to risk, both before, during and after his testimony. William Felix's fear of retribution is so great that on Friday he was willing to come here, and say, I don't know who he is. That's how strong his fear is that; that's why he had to come to court every day being brought personally by the detective."

Defense counsel's objections to these comments were overruled. Moreover, the court, in the presence of the jury, added: "He was in custody prior to the weekend on Monday—withdrawn. Friday he was not in custody, he was in custody before Friday. That's why he came to court every day personally picked up by the detective, not by the normal means of coming to court. That's why he was moved from Rikers Island where he was threatened *[sic]* to Bronx House of Detention. When he was assured that he would be put in protective custody he was willing to continue. He was moved back to the only facility where they have the kind of protective custody that could insure his safety. The only facility where he could be put in a single cell by himself. Bronx House of Detention doesn't have that kind of protection for prisoners."

Upon defense counsel's objection that "these are facts not in

evidence", the court further told the jury: "I don't recall exactly but I recall that there was some testimony that they don't have maximum security facility at the Bronx House. I think, there was testimony to that".

Moments later, the prosecutor referred yet again to Felix's fear, telling the jury: "The last thing that he wanted to do was come in here and testify against this defendant but not because this didn't happen to him, because he has to go on with his life after this trial is over and he has fears. Although he knows exactly what happened to him, he feels for his own reasons that his safety is more assured by not testifying against this man".

It is noteworthy that during deliberations the jury requested, *inter alia,* a readback of Felix's testimony regarding the incident. Ultimately the jury acquitted defendant of the two robbery counts charged, which alleged serious physical injury and use of a dangerous instrument, respectively, although it convicted defendant of the assault charge.

While defendant does not, on appeal, challenge the introduction of the nonattributed threats to explain Felix's inconsistent testimony regarding identification, he contends the court erred by failing to caution the jury not to speculate whether defendant had made the threats and not to construe the threats as evidence of defendant's guilt. We agree.

It is appropriate to elicit testimony concerning nonattributable threats made to a witness where the purpose is to explain inconsistent statements brought out by defense counsel, provided that the jury is duly cautioned as to the way in which it may use this evidence. The Court of Appeals, in *People v Buchalter* (289 NY 181, 202-203 [1942]), held that a witness may explain that he had given false answers because he was afraid of the defendant, which in that case, was an unquestionably reasonable fear since he had been shot through the head four days after he had testified before the Grand Jury.

Where testimony that a complainant recanted her identification due to threats was admitted to explain an inconsistent statement elicited by defense counsel is "followed by explicit limiting instructions by the Trial Judge to the jury pointing out that it was allowed only to show the state of [the complainant's] mind * * * to show the reason why [the complainant] made the allegedly false statement", any potential prejudice to the defendant is dissipated. *(People v Wortherly,* 68 AD2d 158, 163-164 [1st Dept 1979].)* Conversely, it is error, where there is no evidence connecting the defendant to such a

threat, to admit the testimony "in the absence of an instruction from the court limiting the relevancy of the threat to the reasons for [the complainant's] seemingly fearful behavior." *(People v Leon,* 121 AD2d 1, 10 [1st Dept 1986].)

In the case at bar, the court failed to issue the required limiting instructions. This resulted in an implicit invitation to the jury to speculate that defendant made, or was responsible for, the alleged threats Felix received. *(See, People v Trinidad,* 59 NY2d 820, 821 [1983]; *People v Leon, supra.)* Moreover, the court's subsequent comments to the jury regarding Felix's repeated prison transfers, to avoid threat of harm, constituted an explicit invitation to speculate that defendant had threatened Felix. The court's general charge that it had no opinion and that the jury should not consider whether it had did not serve to diminish this error. *(See, People v Yut Wai Tom,* 53 NY2d 44, 57, n 8 [1981].)

We also observe that the prosecutor's summation, which repeatedly alluded to Felix's fear and threats to his safety, ventured far beyond " 'the four corners of the evidence' ", and forayed well past what we consider to be an appropriate response to defense counsel's summation. *(People v Ashwal,* 39 NY2d 105, 109 [1976].)

We find that the errors complained of are not harmless. *(People v Crimmins,* 36 NY2d 230, 237 [1975].) Aside from any inconsistencies regarding identification in the testimony of Felix, there were substantial inconsistencies in his varying descriptions of the events in question. We are persuaded that the jury may well have acquitted defendant in this case, which hinged upon the testimony of a career criminal who had used heroin shortly before the incident, but for error herein. Certainly the chances that defendant would have been convicted on the basis of Felix's testimony alone were, at best, questionable, as the split verdict illustrates. Concur—Murphy, P. J., Carro, Kassal and Rosenberger, JJ.