THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PATRICK NORTON, Appellant.

First Department, December 18, 1990

APPEARANCES OF COUNSEL

*Philip L. Weinstein* for defendant.

*Leonard I. Picker* of counsel *(Norman Barclay* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

CARRO, J.

It is axiomatic that a criminal conviction cannot be sustained where the People's proof is based upon hearsay evidence unless an exception to the rule against hearsay is applicable. In the case herein appealed from, the trial court ruled that a series of statements, made by defendant's alleged victim, were admissible as excited utterances. However, because the circumstances surrounding the hearsay statements cannot reasonably support the conclusion that the statements were made under the influence of a startling event, we hold that the statements constituted inadmissible hearsay. Their admission into evidence therefore violated defendant's fundamental right to confrontation, and a reversal is required.

Paul Roldos was stabbed in the right leg at 7:20 P.M. in the evening on January 17, 1989 on West 19th Street between Seventh and Eighth Avenues in the Chelsea area of New York County. Of this, there is no question. Neither is there any

question that he sustained a two centimeter cut. Thus, the sole issue at trial, which while not complex, was hotly contested, was who, in fact, stabbed Roldos.

In this regard, Roldos, who refused to testify at trial was, nonetheless, the star of the show, if not the star witness.[1] His accusations of defendant were, over vociferous and specific objections, admitted under the excited utterance exception to the hearsay rule. His tape recorded recantation was offered by defendant to impeach the credibility of these initial accusations, made on the evening in question.

At 7:20 P.M. on the date of occurrence, Police Officers Luis Hernandez and Joseph Orosz were in their marked patrol car when a Hispanic man—Roldos—"hopped" or "was running" towards their car while simultaneously holding his right thigh. The officers testified that they were apprehensive at Roldos' approach, believing he may attempt to engage in some sort of criminal conduct. Hernandez then testified that Roldos "was sweating, white, he had a scared look on his face" and "was speaking very fast and seemed very frightened." Defense counsel's prompt and duly made objection that any forthcoming statements by Roldos could not be admitted as excited utterances because, *inter alia,* he had time to reflect, was curtailed by the court. The court determined that Roldos' statements were admissible because they were made "on the very heels of the event in question" by a "scared" Roldos.

Hernandez was then permitted to testify that, upon his inquiry as to what was wrong, Roldos told him, "I have been stabbed, get me to the hospital." Answering Roldos' request with one of his own, Orosz told Roldos to get into the back seat of the car; Roldos complied, without benefit nor, apparently, any need of assistance.

After Roldos got into the car, Hernandez asked him to describe the assailant; Roldos answered that he had been stabbed by a "white guy, tall, three-quarter length beige down jacket." Significantly, he did not tell the officers during this second statement either that he knew his attacker or had knowledge of where the attacker lived. According to Hernandez, Roldos did not include any facial hair in the description; Orosz in contrast, testified that Roldos did include a mustache

---

1. We note that this refusal by Roldos, who testified in the Grand Jury but subsequently recanted, was unwavering; despite a promise of immunity from the prosecutor, he persistently asserted his Fifth Amendment right against self-incrimination, prompting a finding of contempt by the court.

in the description. Both officers duly recorded descriptions in their memobooks.

Approximately one minute later, another Hispanic man, Roldos' friend Jason Joshua, approached the police car, asking Roldos what happened. In response to this inquiry, Roldos allegedly answered, "Patty that motherfucker, stabbed me."[2] This alleged third statement was the first to include any personal reference. It is noteworthy that not only did neither officer record this alleged statement, but Orosz did not testify to it in the Grand Jury.

This third alleged statement prompted not only an objection, but a motion for a mistrial from defense counsel. The court, in overruling and denying, respectively, told defense counsel "a leg wound can be a fatal injury," and specifically ruled that the statement to Joshua was included in "a continuing conversation still within the compass of the excited utterance."

Roldos was brought to St. Vincent's Hospital in Greenwich Village; despite Roldos' wound, the officers stopped, en route, at Eighth Avenue and 17th Street and had a conversation with a group of men. As a result of this conversation, Hernandez and Orosz split up, with the former going into a subway entrance, and the latter proceeding to take Roldos to the hospital. Orosz testified that on the way to the hospital, but *after* the officers had stopped at 17th Street, Roldos made a fourth statement, that "he was scared, he wanted to get rushed to the hospital as quickly as possible", because "he thought he was losing a lot of blood and that he was going to die." Defense counsel objected and was overruled yet again.

Hernandez did not observe anyone in the subway who met the description, and so proceeded to the hospital. In the meantime, the description, including facial hair features of a mustache and beard, was broadcast on the police radio. Roldos made another statement, correcting the description, telling Orosz the assailant had a mustache, but not a beard. Orosz had this corrected description broadcast, and then, apparently for the first time, asked Roldos if he knew the assailant. Responding to the inquiry, Roldos answered in the affirmative

---

2. Orosz testified that Joshua approached after the description was taken; Hernandez, while agreeing that Joshua arrived a minute or so after Roldos, testified that they took the description after Roldos' statement to Joshua. The latter is refuted by the fact that the officers did not have any name accompanying their noted descriptions.

and, curiously, only then, after having made five previous statements, told Orosz he had been with Joshua when he was stabbed. Significantly, Orosz conceded at trial that he failed to record these alleged statements in his memobook, and never questioned Joshua. Arriving at the hospital, at approximately 7:30 P.M., Orosz helped Roldos, who by then could not walk unassisted, out of the car and supported him as they went inside. Orosz recalled at trial that it was only at this time that he noticed "a wetness down about four inches below [sic] his knee," and blood on the back seat.

Contemporaneous with this, Police Officers David Ojeda and Edward Modrak, with their respective partners, were on patrol when they heard the radio description of the suspect, and proceeded to the subway station at 23rd Street and Eighth Avenue in order to cut off a potential escape route. Ojeda told the conductor of the train on the platform not to open the doors. Officers at either end of the platform walked towards one another while scanning the cars for the assailant. Modrak and Ojeda simultaneously saw defendant, who indisputably matched the description given by Roldos, in one of the cars of the train. Modrak testified that, upon seeing the officers, defendant went between two cars, took an object, later discovered to be the knife used in the stabbing, from his right jacket pocket and surreptitiously dropped it to the track, where it "clanked" to the ground.

The officers ordered defendant to stop, which he did, and then arrested him. Defendant objected, stating that he was on his way home from work to New Jersey and asking what was the matter. When the train departed, Ojeda recovered from the track a brown-handled knife which had bloodstains on both sides. Ojeda asked defendant if the knife was his, which he denied. Upon learning that the victim was at St. Vincent's Hospital, Ojeda brought defendant there, arriving at approximately 7:30 P.M.

At the hospital, Ojeda also interviewed Roldos. He asked for a description, which Roldos gave. During this question and answer, Ojeda acknowledged that he was unaware of how serious the injury was, which he did not see. Nor was Ojeda aware of whether Roldos was in any pain; Ojeda admitted that he therefore concluded that Roldos was not in pain.

After satisfying himself that defendant fit the description of the suspect, Ojeda had his partner bring him in to be shown to Roldos for an identification. Roldos, upon seeing defendant,

pointed at him and, in classic fashion, said "that's the guy, that's the one who did it." Defendant immediately responded "Paulie, tell him I didn't do it. Paulie, tell him you're going to drop the charges."

Once the identification was made, Ojeda inquired of Roldos further, asking for a description of the knife. Roldos responded, articulately and in detail, that he was stabbed with a brown-handled knife "this long". Ojeda then displayed the bloodstained weapon he had recovered, which Roldos allegedly promptly identified—an identification Ojeda failed to record in his notes. This entire line of testimony was objected to on the grounds that it was not within the excited utterance exception to the hearsay rule, in view of the fact that it was too remote in time from the incident, and in the course of an inquiry conducted while Roldos was being treated. Defense counsel also asserted that "the police officer caused the defendant [sic] to make this statement by asking him—by showing him the knife." Again, the objections were overruled.

While Roldos' injuries are not in dispute, certain notations in his medical records are, to our view, pertinent. At the time of his admission, his pulse was "good" and his "Communication Ability/Limitations" were found to be "ad lib." His lab results were "within normal limits" and there were no "traumatic injuries to [the] distal SFAR branches."

The defense case consisted not only of defendant's testimony, but also a tape recorded recantation, made by Roldos to defense counsel on April 14, 1989, which was introduced "for the sole purpose of assisting [the jury] in evaluating the credibility of Roldos."

It is said that a reviewing court, facing a cold, bare record cannot see, hear or have a real feel for the witness, but can only read the words typed on the pages of the record. However, *this* reviewing court was *not* without benefit of examining the demeanor of the victim Roldos. We have listened to his tape recorded recantation, and find Roldos to have sounded calm, and fairly articulate, not fearful or confused. Roldos acknowledged talking to defendant before going to see defense counsel but unequivocally stated that he had not been coerced or threatened in any way.

Insofar as the substance of the tape is concerned, Roldos told defense counsel that defendant was present at the time of the crime but that it was another man, not defendant, who stabbed him. Roldos said this man was one of a pair of men

who had been in defendant's company. He described the assailant's appearance as "white, dark hair * * * shorter than [defendant]", a man Roldos "never saw before." Roldos reaffirmed that "the other guy, not [defendant]" stabbed him, and that defendant was not a participant in any way.

Regarding how the confrontation in which he was stabbed developed, Roldos said: "I was in, almost in the video store and somebody ah slapped Pat * * * ah, slapped my friend in the ear. My friend got a little bit upset about it, kind of blew it out of proportion, and we got, we almost got into a fight with these three guys, Patrick Norton and his two friends, who I don't know. And, we kind of, everything cooled down, and, but my friend wasn't satisfied with that, he, we went over to 19th Street where he lived, where he said he was probably gonna go get a bat, you know, just in case these guys bother, decide to bother him. Patrick Norton and his two buddies came on 19th Street. I spoke to them, the confrontation became an argument and I was stabbed in the right inner thigh. I blamed Patrick Norton, 'cause he was the only one there that I knew."

As illuminating as it was compelling was Roldos' later statement that "I accused him [defendant] because he was the only person there that I knew and I wanted justice. I didn't want to be stabbed and nobody's going to take the fall for it." This statement, made in a frank and lucid tone of voice, is demonstrative not only of this victim's understandable rage and desire for vengeance, but is perhaps typical of human nature. In sum, it is powerful impeachment material.

Testifying on his own behalf, defendant said that he had grown up in Chelsea, near Roldos, whom he had known "all [his] life," as he was a friend of Roldos' older brother, who had died five years earlier after a drug overdose. He described his relationship with Roldos as an acquaintanceship from the neighborhood. On the night in question, he was on his way home from spending some time, after his workday, at his brother's house on 16th Street in Chelsea to his parents' home in Weehawken, New Jersey, when he ran into a friend named John Flynn, on 18th Street and Eighth Avenue. Another acquaintance, "Casamero," was with Flynn.

The trio proceeded along Eighth Avenue, where they saw Roldos and Jason Joshua at the corner of 17th Street. Defendant testified that he went behind Joshua and tugged on his ear "like a friendly gesture, like saying hello." Joshua inter-

preted this gesture rather differently, and turned around, cursed at defendant and "took a swing" at him. Roldos restrained Joshua while the three men departed, walking up Eighth Avenue. According to defendant, when the trio arrived at 22nd Street, Joshua, accompanied by Roldos ran up behind the men; Joshua brandishing a gun, again cursed at defendant, and told defendant he would kill him if he "ever put [his] hands on [him] again."

Defendant further testified that, at this, he told Joshua not to "go crazy over nothing"; however, when Joshua put away the gun, defendant and Flynn chased him down the street. Roldos, again trying to calm a volatile situation, then grabbed defendant about the waist from behind, in an effort to restrain him. It was then that Roldos was stabbed, by Flynn, which defendant claimed he did not see but did, in a sense, hear, as Roldos exclaimed "Ah" and ran up 19th Street to Joshua, all the while holding his leg. Meantime, Flynn ran the other way, towards the 14th Street train station.

Defendant was adamant in his testimony that not only did he not participate in the stabbing, but he had not known that Flynn had had a knife in his possession. Defendant further contended that after walking to the train station, he again encountered Flynn, who, upon seeing the police at the station, gave him the knife and asked him to dispose of it. Agreeing to do so, defendant nonetheless demanded to know why Flynn had stabbed Roldos. Flynn allegedly responded that he did so because he thought Roldos was trying to hold defendant for Joshua.

On cross-examination, summation, and now, on appeal, the People make much of the fact that defendant did not call an ambulance. We are not impressed by this argument, and note that Roldos' undisputed mobility after the confrontation and the testimony of the police witnesses make it clear that the wound was not perceived, by anyone present, as requiring an ambulance.

Defendant's testimony regarding his arrest and identification was substantially the same as that of the officers with one exception; he contended that he told them about the confrontation with Joshua and that Joshua had been armed.

Defendant also testified that two months after the arrest, Roldos apologized, but that, on advice of counsel, he did not speak to Roldos, referring him instead to his attorney. On cross-examination, the prosecutor made repeated allusions to

threats, asking defendant, *inter alia,* "[y]ou don't think it's a reason [Paul Roldos would be afraid of defendant's friends] that one of your friends, according to you, has already stabbed him once?" Defense counsel's objections to these questions, many of which had a rhetorical tone, were overruled. Defendant repeatedly testified that there was no reason for Roldos to fear him or his friends, especially given that he and Flynn were no longer friends, because after the subject incident Flynn refused to speak to the authorities.

Similarly, on summation, the prosecutor repeatedly urged that Roldos' recantation was induced by threats. This was in flagrant violation of the court's caution—adhered to by defense counsel—that they were "to make no allusions to Paul Roldos insofar as his absence" was concerned, and a particular caution to the prosecutor that to allude to threats "that you [the DA] suspect * * * have no bearing or relevance in this case. And, in effect, foment *[sic]* a mistrial or reversible error." Indeed, the theme of threats was at the fore throughout the prosecutor's summation, which included, over objection, playbacks of portions of Roldos' tape accompanied by the prosecutor's editorial comments, to the effect that "fear might be the motivating factor" behind the recantation and that Roldos' mother was "nervous." Defense counsel's objections, based upon, *inter alia,* the "pure speculation" of the prosecutor, were repeatedly overruled.

Defense counsel subsequently made a motion for mistrial based upon the prosecutor's allusions to threats, which he correctly asserted constituted a violation of the court's directive, a motion which was flatly denied. The court, after ruling that the prosecutor's arguments "were legitimate inferences he could draw the jury's attention to in the totality, in the context of the case" also refused counsel's request for a limiting instruction that the jury "should accord no inferences that the complainant was threatened."

■ On this appeal, we first hold that none of Roldos' hearsay statements should have been admitted as excited utterances, nor do we believe that several conversations in issue, conducted in various places by various people, should have been admitted as a "continuing conversation within the compass" of that exception to the rule against hearsay. The rule prohibiting the admission of hearsay has been described by Judge Cooke as "the best known feature of Anglo-American law". *(People v Caviness,* 38 NY2d 227, 230 [1975].) This rule, of course, prohibits the use of out-of-court statements when

they are offered into evidence to prove the truth of the matter asserted therein. (Richardson, Evidence §§ 200, 201 [Prince 10th ed]; *People v Nieves,* 67 NY2d 125, 131 [1986].) The underlying reason for the rule is that the party against whom the statement is offered is deprived of the opportunity to confront the declarant and lay bare whatever weaknesses there may be in his story by inquiring into his veracity, the accuracy of his perception and/or his ability to recall past events correctly. (Richardson, Evidence § 201 [Prince 10th ed].)

There are, however, certain enumerated exceptions to the hearsay rule. When seeking to have a hearsay statement admitted for the truth of the matter asserted under one of these exceptions, the burden is upon the proponent of the evidence to establish that the statement comes within one of these exceptions to the rule and therefore satisfies the threshold admissibility test applicable to the exception. *(See, People v Morgan,* 76 NY2d 493, 497-498 [1990]; *People v Nieves,* 67 NY2d 125, 131 [1986], *supra.)*

The exception at issue in the case at bar, that of the excited utterance or spontaneous declaration, is a "true exception to the hearsay rule" *(People v Marks,* 6 NY2d 67, 71 [1959]), where the statement is made under the "immediate and uncontrolled domination of the senses" *(supra,* at 71). Excited utterances are statements made "under the stress of excitement caused by an external event sufficient to still [the declarant's] reflective faculties, thereby preventing opportunity for deliberation which might lead the declarant to be untruthful." *(People v Edwards,* 47 NY2d 493, 497 [1979].) This is a "brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection and deliberation." *(People v Caviness, supra,* 38 NY2d, at 230-231.)

As the People proposed that the Roldos statements should be admitted as excited utterances not within the scope of the hearsay rule, the burden was thus upon them to demonstrate that his statements were made "while under the stress or influence of the excitement caused by [the startling] event, so that his reflective capacity was stilled." *(People v Nieves, supra,* 67 NY2d, at 135.) The criteria to be met in this regard were articulated by the Court of Appeals in *People v Edwards (supra,* 47 NY2d, at 497): "The court must assess not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, *but also the activities of the declarant in the interim to ascertain*

*if there was significant opportunity to deviate from the truth.*
Above all, the decisive factor is whether the surrounding
circumstances reasonably justify the conclusion that the re-
marks were not made under the impetus of studied reflection"
(emphasis added).

Thus, there is no arbitrary time limit, one second after
which a statement will cease to be spontaneous or excited.
*(People v Brooks,* 71 NY2d 877, 878 [1988]; *People v Brown,* 70
NY2d 513, 520-521 [1987].) Rather, it is necessary to review
the facts of the case to consider the atmosphere surrounding
the statements and thus determine whether they were precipi-
tated by the subject event. *(See, People v Acomb,* 87 AD2d 1, 9
[4th Dept 1982].) In so doing here, we focus upon the physical,
psychological and emotional condition of the declarant, Rol-
dos, along with the circumstances surrounding the statements,
including his actions after the confrontation. *(People v Brown,
supra,* 70 NY2d, at 522.) We are also of the view that it is
vitally important to consider whether Roldos had, in addition
to an opportunity to reflect, a reason to fabricate a story
implicating defendant. *(People v Marks, supra,* 6 NY2d, at 73;
*People v Hall,* 260 App Div 421, 423-424; *compare, People v
Sostre,* 51 NY2d 958, 961 [1980].)

First and most obviously, we deal with the effect the event
of the stabbing had physically on Roldos. We decline to adopt
defendant's contention that "the injury was not serious" given
that the two-centimeter wound required a two-day hospitaliza-
tion and the subsequent use of a crutch; however, neither do
we embrace the People's position that if Roldos was "sweating
and shaken because he only *thought* he had been assaulted"
(emphasis in original) that would automatically elevate the
injury to the level of physical trauma courts consider suffi-
cient to precipitate an excited utterance. There are many
cases upon which we may rely in this regard. *(See, e.g., People
v Brown, supra,* 70 NY2d, at 520 [holding statements to be
excited utterances "(g)iven the sudden and violent nature of
event, the mortal wounds inflicted (by several shotgun blasts),
the extreme pain and the unrelenting physical and emotional
trauma caused thereby"]; *accord, People v Brooks, supra,* 71
NY2d, at 878; *see also, People v McCullough,* 73 AD2d 310 [1st
Dept 1980] [victim shot six times, bleeding profusely, in shock
and under stress of acute trauma].)

In the instant case, we do not believe the injury, in and of
itself, was sufficient to have precipitated excited utterances in
the legal sense of that phrase. The transcript amply and

repeatedly demonstrates that the officers were, contrary to their claims at trial, unimpressed by the injuries. A recapitulation in this regard includes, but is not limited to: Hernandez' testimony that Roldos was "running" towards the police car; the fact that Roldos got into the car unassisted; the nearly nonchalant stop for a "conversation" on 17th Street en route to the hospital; Orosz' failure to notice blood or "the wet spot" on Roldos' leg until arrival at the hospital; and Ojeda's not noticing the wound *at all* during his fairly extensive interview of Roldos and his total lack of any awareness that Roldos was in any pain some 15 to 20 minutes after the stabbing. Also relevant is Roldos' "ad lib" conversational ability and "normal" vital signs.

The factor of inquiry must also be considered in this case. In doing this, we are mindful of the caution issued by the Court of Appeals that, "[t]o be sure, if the question propounded or *the identity of the questioner* may suggest or influence the response or if it is asked an appreciable length of time after the startling event, the declarations might very well lack the inherent reliability basic to the rule." *(People v Edwards, supra,* 47 NY2d, at 499 [emphasis added].) While the court in *Edwards* held the statements properly received in evidence as spontaneous statements in response to inquiry made by the declarant's brother, who came to her after she was stabbed with an ice-pick, the circumstances herein are on the other end of the spectrum. The running Roldos approached the officers, who, in fact, initially thought him to be a possible crime perpetrator rather then crime victim. They extensively questioned him as he reported the crime. Indeed, every statement save the statement to Joshua was prompted by police questions or statements. In this regard, we find ourselves in agreement with the argument of defense counsel that "there is no rule stating that every time a complaining witness approaches a cop after an incident, that its a spontaneous declaration or excited utterance." Statements such as those herein are in sharp contrast to those admitted in cases such as *People v Brown (supra,* 70 NY2d, at 516 [where the victim's eyes were turning in as she answered questions while she lay dying]).

Nor do we consider the emergency room question and answer conducted by Officer Ojeda to fall within the limited scope of inquiry upheld in excited utterance cases. The facts surrounding the Ojeda interview are even less strong than those in *People v Nieves (supra,* 67 NY2d, at 129), where the

Court of Appeals held that the emergency room inquiry, conducted as the stabbing victim was going into and coming out of physical shock, did not conclusively demonstrate that the victim's statements were excited utterances. In a similar vein, the emergency room identifications of defendant and the knife cannot be held to be anything other than inadmissible hearsay. *(Matter of Danny R.,* 50 NY2d 1026, 1028 [1980]; *cf., People v Grant,* 113 AD2d 311, 314 [2d Dept 1985].)

Moreover, it is quite clear that brief though the time frame involved was, it was nonetheless enough for Roldos to reflect upon the events which had transpired, even as he fled the scene. *(See, People v Marks, supra,* 6 NY2d, at 73-74; *accord, People v Acomb, supra,* 87 AD2d, at 9-10 [where the victim's reflective capacity was established by his ability to remove himself from the remote place he was shot to a public highway].) Similar to the victim in *Acomb,* Roldos had the presence of mind to go to the police and seek assistance.

Furthermore, Roldos clearly had a motive—revenge—to fabricate his initial statements. *(See, People v Fields,* 151 AD2d 598, 599-600 [2d Dept 1989]; *People v Hall,* 260 App Div 421, 423, 424 [3d Dept 1940], *supra; compare, People v Settles,* 46 NY2d 154, 166 [1978].) The most compelling evidence in this regard is the Roldos tape, which unambiguously impeaches the hearsay evidence, and indicates that the hurt and justifiably angry Roldos wanted someone to pay for his injuries, even in the brief time before he made the first statement. *(Compare, People v Sostre, supra,* 51 NY2d, at 960; *see also, People v Nieves, supra.)* This is highlighted by the fact that it was only during Roldos' third statement, to Joshua, that an assailant was named, despite, the indisputable evidence that defendant and Roldos had known each other their whole lives, and that Roldos had prior opportunities to name the perpetrator.

■ Thus, upon our application of the legal standards to the facts in the case at bar, we conclude that the prosecutor failed to establish that a single one of the hearsay statements constituted an excited utterance, in view of the circumstances surrounding the statements. Moreover, the error cannot be considered to be harmless *(People v Crimmins,* 36 NY2d 230, 242). There is a significant probability that the jury would have made a different finding but for the erroneous admission of the hearsay testimony, especially since defendant's mere presence at the scene of a crime would not constitute criminal conduct. *(People v La Belle,* 18 NY2d 405, 412-413 [1966]; *People v De Jesus,* 123 AD2d 563, 564 [1st Dept 1986]; *cf.,*

*Matter of Danny R., supra.)* We therefore reverse the conviction and remand for a new trial.

■ While the primary reason for our reversal in this case concerns the hearsay issue, we also agree with defendant's second contention, that the prosecutor's misconduct was so egregious as to independently require a reversal. While the court and counsel were aware of the unique factual situation which resulted in Roldos asserting his Fifth Amendment right against self-incrimination, there was no evidence before the jury explaining the victim's absence. It was, therefore, entirely inappropriate, as well as in violation of the trial court's order, for the prosecutor to repeatedly question defendant, and to sum up on, threats which were not only nonattributable, but very likely nonexistent. *(People v Arroyo,* 79 AD2d 950 [1st Dept 1981], *affd* 54 NY2d 567 [1982]; *see also, People v Lozada,* 104 AD2d 663, 664 [2d Dept 1984].) Even had there been one scintilla of evidence that Roldos had been threatened, the prosecutor went far beyond the four corners of the evidence in attributing such threats to defendant and/or his friends. *(People v Rivera,* 160 AD2d 267, 269-271 [1st Dept 1990].)

We find exceptionally deplorable the way in which the prosecutor, in the course of his summation, used and annotated Roldos' tape recorded recantation. He expressly invited the jury to reject the recantation because of the alleged threats and implicitly invited them to infer that such threats were probative of defendant's guilt. *(People v Shilitano,* 218 NY 161 [1916].)

Moreover, the lack of instructions to the jury regarding the tape exacerbated the resulting harm and prejudice to defendant. *(See, People v Trinidad,* 59 NY2d 820, 821 [1983]; *People v Rivera, supra; see also, People v Wortherly,* 68 AD2d 158 [1st Dept 1979].) Furthermore, "when, as here, the court overrules the defendant's objections, and gives 'standing to the statement of the District Attorney as legitimate argument' * * * the possibility of prejudice is greatly enhanced." *(People v Ashwal,* 39 NY2d 105, 111 [1976].) The result was, as the trial court predicted in its precharge conference, reversible error.

Accordingly, the judgment of Supreme Court, New York County (Edwin Torres, J.), rendered January 3, 1990, convicting defendant, after a jury trial, of assault in the second degree and criminal possession of a weapon in the third degree, and sentencing him to concurrent indeterminate terms

of imprisonment of 3 to 6 years, should be reversed, on the law, and the matter remanded to a new trial.

MURPHY, P. J., Ross and ROSENBERGER, JJ., concur.

Judgment, Supreme Court, New York County, rendered on January 3, 1990, unanimously reversed, on the law, and the matter remanded for a new trial.