THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ERNEST SEYMOUR, Appellant.

First Department, October 15, 1992

## APPEARANCES OF COUNSEL

*Joanne Legano* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Allen H. Saperstein* of counsel *(Billie Manning* with him on the brief; *Robert T. Johnson, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

ELLERIN, J.

Defendant was convicted of felony murder, burglary and robbery based on evidence that he entered the apartment of his neighbor, 79-year-old Frank Sherman, tied him up, and robbed him, thereby causing Sherman's death three months later. On appeal, defendant contests the sufficiency of the evidence demonstrating that he caused the victim's death and also argues that the court erred in admitting into evidence as spontaneous declarations two unsworn statements by the victim.

A review of the evidence establishes that the evidence was sufficient as a matter of law to establish a causal link

between the injuries inflicted during the burglary and the victim's death 104 days later and that the verdict was not against the weight of the evidence *(People v Bleakley,* 69 NY2d 490).

In order to prove that defendant's conduct caused the decedent's death, the prosecution was required to establish that it "forged a link in the chain of causes which actually brought about the death" and that it was a *"sufficiently direct cause"* of the death *(People v Stewart,* 40 NY2d 692, 697, quoting *People v Kibbe,* 35 NY2d 407, 413). It is not necessary that the defendant's conduct have been the immediate or the only contributing cause, though "if 'the death is solely attributable to the secondary agency, and not at all induced by the primary one * * * its intervention constitutes a defense' " *(People v Stewart, supra,* at 697, quoting *People v Kane,* 213 NY 260, 270).

In this case, expert testimony clearly demonstrated that the decedent's death was precipitated in part by a heart attack which he suffered either during the attack or while he lay in his apartment for up to 48 hours awaiting rescue, and which was clearly linked to the extraordinary physical and emotional stress to which he had been subjected by defendant. Expert testimony also showed that his death was linked to his reactions to the severe dehydration which he suffered while he was immobilized in his apartment. While there is no question that the elderly decedent, who had lost both his larynx and one of his legs to cancer 18 years earlier and who also had an enlarged heart, was in poor health and that his death was in part linked to his preexisting condition, this would not absolve the defendant where his conduct also directly contributed to the result *(see, Matter of Anthony M.,* 63 NY2d 270, 280).

■ Although the evidence is sufficient to sustain the verdict, we find that the admission into evidence of the second out-of-court statement made by the victim of the crime was prejudicial error requiring a new trial.

At a hearing on the admissibility of the decedent's two statements, Housing Officers McGillycuddy and Kimbrough testified that, at 10:25 A.M. on June 30, 1988, they found 79-year-old Frank Sherman in his Seward Avenue apartment lying face down on the kitchen floor. His head was bound to the table with gauze and his hands were tied behind his back so tightly that the cord was cutting into his wrists. At first the officers believed that Sherman, whose skin was yellow and

caked with blood and mucous and whose eyes were open and staring, was dead, but when they saw his foot move, they called an ambulance. They did not speak with him because he was not conscious. In the ambulance, Sherman apparently gained some degree of consciousness but was "drifting off" as the EMS personnel spoke to him. At Jacobi Hospital, Detective Lutterloh attempted to interview Sherman, but Sherman, due to the loss of his larynx, was unable to communicate without a voice box, and the box supplied by the hospital was not working properly. Nevertheless, while the medical personnel were still working on Sherman's injuries, Lutterloh was able to elicit that some persons whom Sherman knew and who lived on the fourth floor had come into his apartment and bound him. This conversation took place at approximately 11:50 A.M.

Detective Beckel went to Sherman's apartment and retrieved his voice box and, after returning to the hospital at approximately 12:10 P.M., again interviewed Sherman. According to Beckel, at this point, Sherman told him that: "two males [did it,] one was Ernie who lived in 4B in his building * * * he had asked Ernie that day to look at his lock because it had needed fixing. Him and one other male hispanic came up to the apartment, looked at the lock. Ernie said he could fix it * * * [later] Ernie and the other man pushed him in the apartment, threw him to the ground, assaulted him, wrapped gauze around his head, bound his hands * * * took approximately one thousand dollars from him, ransacked the apartment."

The trial court held that the statements to Detectives Lutterloh and Beckel were both admissible into evidence under the "excited utterance" exception to the hearsay rule. Since, as to the second, more detailed statement to Detective Beckel, we are unable to conclude that such is the case, we reverse.

Spontaneous declarations, also known as excited utterances, have long been recognized as an exception to the hearsay rule (see, e.g., People v Del Vermo, 192 NY 470, 483; see generally, People v Caviness, 38 NY2d 227, 230-231). Over the years, the strict rules limiting the admission of such statements to those which constitute part of the actual res gestae, i.e., verbal acts forming part of the transaction itself, have been substantially expanded, and the focus has shifted to an analysis of whether the statement, whether or not contemporaneous with the startling event, is demonstrated to have been "impulsive and

unreflecting" and "made under the immediate and uncontrolled domination of the senses" *(People v Brown,* 70 NY2d 513, 518-519). In determining whether a statement meets these criteria, the trial court must "ascertain whether, at the time the utterance was made, the declarant was under the stress of excitement caused by an external event sufficient to still his reflective faculties, thereby preventing opportunity for deliberation which might lead the declarant to be untruthful. The court must assess not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim to ascertain if there was significant opportunity to deviate from the truth. Above all, the decisive factor is whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection" *(People v Edwards,* 47 NY2d 493, 497).

While the amount of time that has elapsed between the startling event and the statement is significant, it is clearly not controlling, and the court must look at all the circumstances of each case to determine whether the requisite spontaneity is present *(People v Brown, supra,* 70 NY2d 513; *People v Marks,* 6 NY2d 67, 72, *cert denied* 362 US 912).

In this case, there is no question, and defendant does not dispute, that the initial assault upon and injury to the decedent were sufficiently startling to still his reflective faculties. Defendant contends, however, that, since decedent was lying tied up in his apartment for at least 24, and possibly 48 hours, he had more than sufficient opportunity to subject the events to studied reflection and fabricate an accusation against defendant.

As to the first statement made by the decedent, we find that the defendant's analysis ignores the reality of the situation and is an attempt to impose exactly that type of mechanistic application of the rule which the Court of Appeals rejected in *Edwards (supra) (see also,* 6 Wigmore, Evidence § 1750 [b], at 204 [Chadbourn rev 1976] [admissibility "depends entirely on the circumstances of each case"]). The "startling event" which influenced decedent's ability to deviate from the truth can hardly be said to have ended at the time the elderly decedent's attackers left him, lying on the floor, wounded, with his head tied to the table and his hands bound behind his back, unable to summon help because of his inability to speak. Not until decedent was rescued from this dire situation could he

be said to have been released from the state of intense fear and heightened emotion which is capable of interfering with the ability to formulate a calculated response and which therefore justifies this exception to the hearsay rule *(see, Guthrie v United States,* 207 F2d 19; *People v Gacho,* 122 Ill 2d 221, 241, 522 NE2d 1146, *cert denied* 488 US 910; *Stevens v State,* 232 Md 33, 192 A2d 73, *cert denied* 375 US 886). This is particularly so because the evidence indicates that decedent was unconscious when found and spent at least a portion of the period during which he was tied up in either a semi-conscious or unconscious state *(see, People v Brooks,* 71 NY2d 877; *People v Brown, supra,* 70 NY2d, at 521, citing, *inter alia, State v Stafford,* 237 Iowa 780, 23 NW2d 832 [declarant disoriented for 14 hours after severe battering]; 4 Weinstein & Berger, Weinstein's Evidence ¶ 803 [2] [01], at 803-92 ["factors such as shock, unconsciousness or pain, may prolong the period"]; *see also, State v Plummer,* 117 NH 320, 374 A2d 431 [declarant lapsed in and out of consciousness for three to four hours before making statement]).

In this situation we find that the circumstances overwhelmingly justify the conclusion that, at the time he was rescued, decedent had not yet had an opportunity for "studied reflection." Moreover, we find that circumstances surrounding the hour and 20 minutes which elapsed between the time decedent was found, unconscious, and the point at which the statement was made did not lend themselves to the opportunity to deviate from the truth and therefore render the first statement inadmissible. Indeed, it was not until after decedent was in the ambulance on the way to the hospital at approximately 11:00 A.M. that he even regained some degree of consciousness. Although the Emergency Services report stated that he was sufficiently alert so as to be oriented to his surroundings, his condition was described by the officer who accompanied him to the hospital as "scared", "confused" and "drifting off." That same officer, who was instructed to remain with the victim at the hospital after their arrival at 11:05 A.M. because of the substantial possibility that he would die, thereby necessitating certain identification procedures, stated that up until the time he made the statement decedent remained "dazed" and was clearly in substantial pain from bruises, abrasions and the deep furrows cut into his wrists by the ropes. Once he arrived at the hospital, he was subjected to emergency treatment, which was still going on when he was initially interviewed by Lutterloh, whose questioning was

intermingled with and interrupted by attempts by the doctors and nurses present to communicate with decedent *(People v Moore,* 173 AD2d 568, *lv denied* 78 NY2d 970). Moreover, because the voice box he was using was not working properly, all of his communications at this point were subjected to the additional stress and frustration of attempting to make himself understood in the face of seemingly insuperable obstacles. These circumstances compel the conclusion that he remained incapable of studied refection between the time when he regained consciousness and the time he made the statement *(see, People v Brown, supra;* McCormick, Evidence § 297, at 856 [3d ed] ["that the declarant still appeared 'nervous' or 'distraught' and (under) continuing emotional upset will often suffice"]).

We reject the argument that, because decedent made the statement in response to questioning, its reliability was thereby diminished. There is no implication that the nature of the question asked or the identity of the questioner had any undue influence on decedent or that the questioning caused an interruption in the stress and excitement experienced by decedent *(see, People v Brown,* 70 NY2d, at 522, *supra).* Indeed, because he was essentially unable to speak without a voice box, it is clear that decedent's statement was made at the very first opportunity he had to speak following the attack. Finally, we note that no possible motive has been offered for decedent to fabricate an accusation and there is absolutely no reason to believe that the statement was in any way self-serving *(see, People v Norton,* 164 AD2d 343, *affd* 79 NY2d 808).

While, for these reasons, we find that the initial statement made by the decedent was properly admitted into evidence, we cannot similarly find that the unsworn statement made by Sherman to Officer Beckel at approximately 12:10 P.M., after a 20-minute break in the questioning, meets the criteria defining a spontaneous declaration. This statement was made after decedent had finished receiving emergency treatment for his injuries and after the detective had retrieved decedent's own voice box from his apartment. Thus, the substantial distractions which accompanied the administration of medical care and the attempt to use the unfamiliar and faulty voice box provided by the hospital, both of which contributed to the finding that decedent could not have concentrated sufficiently to fabricate an accusation, were no longer present. Under these circumstances, and in view of the fact that during this period decedent was apparently conscious, reasonably comfort-

able, and capable of reflection, this additional time period was sufficient to eliminate the possibility that, at the time the second statement was made, "the declarant was under the stress of excitement caused by [the] external event sufficient to still his reflective faculties, thereby preventing opportunity for deliberation which might lead the declarant to be untruthful" *(People v Edwards,* 47 NY2d 493, 497, *supra; see, e.g., People v Norton,* 79 NY2d 808, *supra* [statements, the first of which was made almost immediately after knife wound was inflicted, inadmissible where declarant's condition did not demonstrate that his ability to reflect was impaired]; *People v Sostre,* 51 NY2d 958 [statement made five minutes after defendant was shot inadmissible where circumstances showed that he had had an adequate opportunity to reflect]; *People v Marks,* 6 NY2d 67, *cert denied* 362 US 912, *supra* [six-minute interval between shooting and statement renders statement inadmissible where defendant, during that period, was conscious and able to walk some distance from the scene of the shooting on his own]).

Nor can we find that the admission of this statement was harmless error. It was only in the second statement that decedent specifically named defendant as one of his attackers. In the first statement, he merely mentioned that one of his attackers lived on the fourth floor of the building. As the only other evidence identifying defendant came from two witnesses of rather questionable credibility, we cannot say that, without the statement to Detective Beckel, the evidence of identity was overwhelming. Since, in the absence of overwhelming evidence of guilt, harmless error analysis is inapplicable *(People v Crimmins,* 36 NY2d 230, 241), a new trial is necessary.

Accordingly, the judgment of the Supreme Court, Bronx County (Edward Davidowitz, J.), rendered May 16, 1990, convicting defendant of murder in the second degree, robbery in the first degree and burglary in the first degree, and sentencing him to concurrent, indeterminate terms of imprisonment of 22 years to life, 8⅓ to 25 years and 8⅓ to 25 years, respectively, should be reversed, on the law, and the matter remanded for a new trial.

MURPHY, P. J., ROSENBERGER and KASSAL, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered May 16, 1990, convicting defendant of murder in the second degree, robbery in the first degree and burglary in the first degree,

and sentencing him to concurrent, indeterminate terms of imprisonment of 22 years to life, 8⅓ to 25 years and 8⅓ to 25 years, respectively, is reversed, on the law, and the matter remanded for a new trial.